

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-26-2004

# Williams v. Phila Housing Auth

Precedential or Non-Precedential: Precedential

Docket No. 03-1158

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Williams v. Phila Housing Auth" (2004). *2004 Decisions.* Paper 350.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/350

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

---

NO. 03-1158

---

EDWARD R. WILLIAMS;
ANGELYNNE WILLIAMS, H/W

v.

PHILADELPHIA HOUSING
AUTHORITY POLICE DEPARTMENT

Edward R.Williams,
Appellant

---

On Appeal From the United States
District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 00-cv-01709)
District Judge:
Hon. Eduardo C. Robreno

---

Argued January 27, 2004

BEFORE: NYGAARD, FUENTES and
STAPLETON, Circuit Judges

(Opinion Filed: August 26, 2004)

---

Alex H. Pierre (Argued)
1315 Walnut Street - Suite 210
Philadelphia, PA 19107-4705
   Attorney for Appellant

Patrick J. Harvey
David E. Brier (Argued)
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street - 51st Floor
Philadelphia, PA 19103-7599
   Attorneys for Appellee

---

OPINION OF THE COURT

---

STAPLETON, Circuit Judge:

The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, prohibits covered employers from discriminating against qualified individuals on the basis of their disabilities. Edward Raymond Williams was unable to carry a firearm as the result of a mental condition, and was additionally perceived by his employer to be unable to have access to firearms, or be around others carrying firearms. Granting summary judgment in favor of the Philadelphia Housing Authority ("PHA"), Williams's employer, the District Court held that such limitations would not make Williams significantly restricted in the major life activity of working because they did not prevent him from performing work in a broad range of jobs in various classes. Because the District Court did not consider

whether such limitations would prevent Williams from performing work in a class of jobs, and because a reasonable jury could conclude that Williams was actually (or perceived to be) precluded from working in a class of jobs, we will now reverse that grant of summary judgment and remand Williams's ADA discrimination claim (and corresponding claim under the Pennsylvania Human Relations Act) for further proceedings. We will affirm the District Court's determination with respect to Williams's retaliation claims because Williams has not proffered sufficient evidence to support a retaliation claim.

I. *Factual and Procedural Background*

A. The Facts Viewed in the Light Most Favorable to Williams

Williams was hired by PHA as a police officer and worked for PHA for 24 years until his termination. On May 19, 1998, shortly after arriving for an evening shift, Williams received a page to report to the sergeant's office of PHA's police department. After being confronted by a superior officer about his fractious interactions with other employees, Williams yelled and made a number of profane and threatening remarks.

Williams was immediately suspended without pay. Later that evening, he called a counselor with Delaware County Psychological Services, and remarked, "I understand why people go postal." According to a PHA police officer who later spoke with the counselor, Williams talked of "smoking people, going

postal, and having the means to do it."

Two days after the confrontation, PHA wrote to Williams and directed him to report to the PHA radio room for duty. Williams did not return to work, but instead began to call in sick on a daily basis. On June 25, 1998, PHA ordered Williams to undergo a psychological examination with its psychologist, Dr. Lauren Finley.

The parties agree that, sometime in June or July 1998, Williams submitted an application for a medical leave of absence from July 2, 1998 through August 28, 1998. The request included a "medical certification form" completed by Helen Huffington, M.S.S., a counselor with Delaware County Psychological Services, who diagnosed Williams as suffering from "Major Depression, recurrent, severe." A198. PHA approved the request. On July 29, 1998, PHA Assistant Chief Aaron Hughes wrote to Williams regarding his employment status. Hughes wrote, "As of August 20, 1998, you will have exhausted all of your sick leave and annual leave benefits. Therefore, you will have to request through memorandum a leave of absence. . . . [F]ailure to do so will mean that you have voluntarily resigned as a member of this police department." A197. Williams would again be asked, on September 22, 1998, to apply for a leave of absence, and did so.

On August 17, 1998, Williams's personal psychologist, Dr. Marjory Levitt, wrote a letter to Hughes regarding Williams. The letter stated, in pertinent

2

part:

> Sgt. Edward R. Williams, Sr., has requested that I write to you and report on his readiness to return to full time employment beginning August 20, 1998.

> Sgt. Williams states that he is fully prepared physically and psychologically to resume his professional duties. He assures me that he is emotionally stable and able to perform reliably and fulfill his responsibilities. He is not taking any psychotropic medications and denies other substance use, with the exception of a medication for hypertension. He has not been evaluated by a psychiatrist, nor has he been in regular individual outpatient treatment. He does request that his contact with [the PHA superior officer Williams confronted on May 19, 1998] be as limited as possible.

A199.

In August and September 1998, Williams attended three appointments with Dr. Finley, PHA's psychologist. On September 21, 1998, Dr. Finley shared her evaluation of Williams's fitness for duty:

> It is my professional opinion that Sgt. Williams should not resume active duty, involving his usual and normal work activities, unless he is under the proper care of medical and psychological personnel. He requires psychological treatment for depression and stress management. He also requires an evaluation by medical personnel to determine if he may be further helped by psychotropic medications. Sgt. Williams can resume working on alternate work assignments and should do so for a minimum period of 3 months in order to provide an initial opportunity for him to begin receiving benefits from regular medicinal and/or psychological treatment. He should be reevaluated after this time in order to determine whether or not he can resume active duty with the continuation of prescribed treatment regiment for the management of his stress and depression.

> Sgt. Williams [sic] condition appears to be exacerbated by considerable tension between himself and one of his superiors. . . . It

3

could be helpful if the difficulties between them could be mediated or if the amount of contact between the two was greatly reduced.

A200. Upon receipt of the Finley letter, PHA requested clarification of Dr. Finley's findings, to which Dr. Finley responded on October 10, 1998:

> First, I have been called upon by human resources to provide a consultative evaluation for [Sergeant] Edward Williams. I have not nor will I be working with [Sergeant] Williams on an ongoing basis. Second, Mr. Williams is fully capable of working, for a temporary period, in either an administrative and/or clerical capacity. He should not carry a weapon, however, for a minimum period of three months. He can work around other officers who will be wearing their weapon. Third, it [is] anticipated that [Sergeant] Williams will be able to fully return to active duty, resuming his usual job responsibilities after this approximate three month period. However, a more definite time frame cannot be provided at this time,

pending a reevaluation.

A201.

On October 13, 1998, after Dr. Finley had cleared Williams for restricted duty, Williams requested that PHA temporarily reassign him to work in the PHA training unit. Hughes responded:

> [I]t is the position of this police department that the specific position that you are requesting is not open to you due to your on-going treatment with Dr. Lauren Finley . . . and her recommendation that you should not carry a weapon while still under her care for the next several months. This department has also concluded that once you have completed all of your treatment with Dr. Finley, releasing you to return to full duty, with authorization to carry firearms once again, you are to report back to uniform patrol duty.

A204.

One day later, Williams wrote to Hughes requesting an assignment "in the [PHA] radio room until [his] 3 month evaluation [was] over. . . ." PHA did not respond to that request until this litigation

4

ensued.[1]

On November 19, 1998, Deputy Chief of Police Ricks wrote an internal memorandum to Carl Marinelli, Assistant General Manager for Human Resources, regarding Williams's employment status. Wrote Ricks, "Williams has exhausted all of his leave time and should apply for a medical leave of absence. If he does not apply for a medical leave of absence by November 30, 1998, it is the position of this department that Human Resources terminate Edward Williams according to PHA personnel policy regarding medical leave." A863.

On December 3, 1998, Marinelli wrote to Williams requesting that he file for medical leave.

> As you know, you have exhausted all leave time available as a police Officer with the Philadelphia Housing Authority. It is now necessary that you obtain the required medical

evidence and apply for a medical leave of absence. This information and your formal written request should be received by my office no later than December 18, 1998. Failure to do so will result in PHA terminating your employment as of that date.

A206. Williams did not contact Marinelli regarding an application for medical leave and did not respond to the letter.

On December 29, 1998, Marinelli sent a letter to Williams notifying him that he was being terminated.

> In my letter to you dated December 3, 1998 I asked that you request a medical leave of absence and submit that request along with supporting medical evidence to me no later than December 18, 1998. As you have submitted neither, I am notifying you of your termination from the Philadelphia Housing Authority effective August 28, 1998. Please call . . . to discuss your termination benefits.

A249.

B. Procedural Background

Williams filed a complaint against PHA in the United States District Court for

---

[1] The record is unclear as to whether PHA responded to this request, but we assume for summary judgment purposes that PHA did not respond to the radio room request. In the context of this litigation, an affidavit from a PHA Police Department Administrator, John O'Brien, indicated that "[i]nstead of placing Sgt. Williams in the radio room, PHA offered him a leave of absence that would have allowed him to return to work as a police sergeant within 90 days." A202.

the Eastern District of Pennsylvania asserting several causes of action. After the District Court ruled on PHA's motion to dismiss and motion for judgment on the pleadings, only claims asserting discrimination under the ADA and Pennsylvania Human Relations Act ("PHRA") remained. Ultimately, the District Court granted PHA's motion for summary judgment on those remaining claims. Williams timely moved for reconsideration of that order. The District Court denied that motion, and Williams filed a timely notice of appeal.

## II. *Jurisdiction and Standard of Review*

The District Court had federal question jurisdiction under 28 U.S.C. § 1331 with respect to Williams's ADA claims, and supplemental jurisdiction over Williams's PHRA claims under 28 U.S.C. § 1367. This Court has final order jurisdiction under 28 U.S.C. § 1291 to review the District Court's denial of reconsideration, which here ended the proceedings in that Court. *See Sheehan v. Beyer*, 51 F.3d 1170, 1174 (3d Cir. 1995).

We review the District Court's grant of summary judgment to PHA using the same standard that the District Court applied. *Omnipoint Comm. Enter., L.P. v. Newton Township*, 219 F.3d 240, 242 (3d Cir. 2000). "Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law." *Carter v. McGrady*, 292 F.3d 152, 157 (3d Cir. 2002).

## III. *The Retaliation Claim*

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). "Thus, it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003).

"[I]n order to establish a *prima facie* case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show: '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)). Williams argues on appeal that PHA terminated him in retaliation for his request for reassignment to PHA's radio room as a reasonable accommodation.[2]

---

[2]Unlike a claim for discrimination under the ADA, an ADA retaliation claim based upon an employee having requested an accommodation does not require that a plaintiff show that he or she is "disabled" within the meaning of the ADA. "The right to request an accommodation in good

6

Applying the *McDonnell Douglas* framework,[3] the District Court assumed

---

faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC, and we have already explained that the ADA protects one who engages in the latter activity without regard to whether the complainant is 'disabled.'" *Shellenberger*, 318 F.3d at 191. Thus, as opposed to showing disability, a plaintiff need only show that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested. *See id*.

[3]The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to ADA retaliation claims. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

> Briefly summarized, the *McDonnell Douglas* analysis proceeds in three stages. First, the plaintiff must establish a *prima facie* case of discrimination. If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." [*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.] Finally, should the defendant carry this burden, the plaintiff then must have an

*arguendo* that Williams could make out a *prima facie* showing of retaliation. The Court then noted that PHA had put forth a legitimate reason for terminating Williams: Williams had exhausted all available leave time to which he was entitled and failed to request a leave of absence or otherwise contact PHA in response to Carl Marinelli's December 3, 1998, letter. Upon shifting the burden back to the

---

> opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *See Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted). While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. Our experience is that most cases turn on the third stage, i.e., can the plaintiff establish pretext.

*Id.* at 500-01 (quoting *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)) (alterations in original).

plaintiff, the District Court found that he presented "very little in the way of evidence showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action.'" Dist. Court Op. at 18 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)). In addition, the Court held that the timing of Williams's termination on December 29, 1998, occurring over two months after the request for an accommodation on October 21, 1998, was not suggestive of a causal connection between Williams's request for an accommodation and termination. The Court concluded that the summary judgment record would not support a finding that PHA's explanation for the termination was pretextual. We agree.

In support of his retaliation claim, Williams relies primarily on the temporal proximity between his October 21, 1998, request for an accommodation and his December 29, 1998, termination. We have held in the ADA retaliation context that "temporal proximity between the protected activity and the termination [can be itself] sufficient to establish a causal link." *Shellenberger*, 318 F.3d at 183 (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1997)) (internal quotation marks omitted). However, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Shellenberger*, 318 F.3d at 189 n.9 (quoting *Krouse*, 126 F.3d at 503) (internal quotation marks omitted). For example,

two days between the protected activity engaged in and the alleged retaliation sufficed in *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989), to support an inference of a causal connection between the two. Similarly, in *Shellenberger*, comments made by a supervisor suggesting retaliation ten days before termination, along with other evidence of retaliation, were sufficient to establish a *prima facie* showing of causation. *Shellenberger*, 318 F.3d at 189.

Here, over two months elapsed between the time Williams requested a radio room assignment and the time that he was terminated. In cases like this one, "where 'the temporal proximity is not so close as to be unduly suggestive,' we have recognized that 'timing plus other evidence may be an appropriate test. . . .'" *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 513 (3d Cir. 2003) (internal quotation marks omitted)).[4] Williams has, however, put

_____

[4]Williams argues that the retaliatory action in this case occurred not on the date that he was terminated, but on November 19, 1998—the day an internal PHA memo directed Marinelli to write to Williams and demand that he apply for medical leave or be terminated. The memo indicated that "it is the position of this department that Human Resources terminate Edward Williams according to PHA personnel policy regarding medical leave" if Williams "does not apply for a medical leave of absence by November 30, 1998."

forth no other evidence suggesting that PHA terminated him *because* he requested a radio room assignment. Moreover, the evidence supporting PHA's alternative explanation is quite compelling. As Williams acknowledges, PHA had granted Williams medical leave on two prior occasions, and there was no indication that PHA would not have done so again had Williams simply contacted Marinelli, as the letter requested.[5]  Nor is there any dispute that, absent an application and supporting medical certification, termination was the only option available to PHA under the relevant, consistently applied policy.

Because Williams has failed to proffer any evidence of retaliation other than the not unduly suggestive temporal relationship between his request for an accommodation and his termination, we must agree with the District Court that "no reasonable jury could conclude that the two events shared a causal link" for purposes of an ADA retaliation claim. Dist. Court Op. at 22.

## IV. *The Discrimination Claim*

Section 12112(a) of Title 42, United States Code, provides that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of

A510.  Even assuming *arguendo* that November 19, 1998, were the date of retaliatory action in this case, our classification of this case as one "where the temporal proximity is not so close as to be unduly suggestive" would remain the same.

[5]Williams hypothetically suggests in his brief that, although he was aware of PHA's general policy on leaves of absences and PHA's ability to grant a leave of absence for any reason, "perhaps" Marinelli's request in the December 3, 1998, letter to obtain the "required medical evidence" led him to believe that a leave of absence would now only be available to him upon providing that evidence. He then argues in his brief that, if he held such a belief, he would have also thought that it would be impossible to obtain such evidence because he was capable of working and PHA's own expert had cleared him for restricted work.

There is, however, no record support for such an argument. "[W]e have repeatedly held that unsubstantiated arguments made in briefs or at oral argument are not evidence to be considered by this Court." *Versarge v. Township of Clinton N.J.*, 984 F.2d 1359, 1370 (3d Cir. 1993).  Williams has not cited to any record evidence indicating that he held such a belief.

employment.

*Id.*[6] A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must therefore show "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor*, 184 F.3d at 306 (quoting *Gaul v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir.1998) (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996))) (internal quotation marks omitted).

Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities. The ADA specifically provides that an employer "discriminates" against a qualified individual with a disability when the employer does "'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" *Taylor*, 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations in original). "Reasonable accommodation" further "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith," *Mengine v. Runyon*, 114 F.3d 415, 416 (3d Cir. 1997), under what has been termed a duty to engage in the "interactive process," which we will discuss in detail *infra*.

Williams alleges that PHA discriminated against him by (1) failing to provide for the reasonable accommodations that he requested and (2) breaching its duty to engage in the interactive process by not responding in good faith to his requests for accommodations. The District Court held, *inter alia*, that Williams was not "disabled" within the meaning of the ADA and therefore could not make a *prima facie* showing of disability discrimination. We now review *de novo* whether Williams made such a showing.

A. Disability

---

[6]Williams has also brought his disability discrimination claim under the Pennsylvania Human Relations Act ("PHRA"). An "analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). Accordingly, we will only discuss Williams's ADA claim because our analysis of that claim is, under the circumstances of this case, coterminous with the PHRA claim.

A "disability" is defined by the ADA as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Williams asserts that he met the criteria for disability under § 12102(2)(A) ("actual disability") because he had "a physical or mental impairment that substantially limits one or more of the major life activities," in that his mental condition prevented him from carrying firearms. Williams further asserts that he met the criteria for disability under § 12102(2)(C) ("regarded as disabled") because his employer, PHA, wrongly perceived him to be disabled when it treated him as unable to work with, have access to, or be around others carrying, firearms.

### i. Actual Disability

With respect to determining whether an individual is actually disabled within the meaning of the ADA, EEOC Regulations[7] provide that an individual is

---

[7]"Because the ADA does not define many of the pertinent terms, we are guided by the Regulations issued by the Equal Employment Opportunity Commission ('EEOC') to implement Title I of the Act. *See* 42 U.S.C. § 12116 (requiring the EEOC to implement said Regulations); 29 C.F.R. § 1630.2." *Deane v. Pocono Medical Center*, 142 F.3d 138, 143 n.4 (3d Cir. 1998) (*en banc*) (citations omitted).

"substantially limited" in performing a major life activity if the individual is

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can

---

While there is some question as to the level of deference EEOC regulations interpreting definitional terms of the ADA are entitled to after the Supreme Court's decision in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), neither of the parties challenges the reasonableness of the EEOC's regulations with respect to the term "disability." *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 194 (2002) ("[N]o agency has been given authority to issue regulations interpreting the term 'disability' in the ADA. Nonetheless, the EEOC has done so. *See* 29 CFR §§ 1630.2(g)-(j) (2001). Because both parties accept the EEOC regulations as reasonable, we assume without deciding that they are, and we have no occasion to decide what level of deference, if any, they are due.") (citing *Sutton*, 527 U.S. at 479-80).

11

perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Several factors are to be considered in evaluating whether an individual is substantially limited in a major life activity: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2).

Williams contends that his inability to carry a firearm substantially limited him in the major life activity of "working." The EEOC regulations provide that, in determining whether an individual is restricted in the major life activity of working,

> [t]he term 'substantially limits' means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Id.* § 1630.2(j)(3)(i). Several specific additional factors are to be considered in determining whether an individual is substantially limited in the major life

activity of working:

> (A) The geographical area to which the individual has reasonable access;
>
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*Id.* §1630.2(j)(3)(ii).

Summarizing these regulations, the Supreme Court has held that

> [t]o be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a

specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton*, 527 U.S. at 493. The question of whether an individual is substantially limited in a major life activity is a question of fact. *See Gagliardo v. Connaught Lab., Inc.*, 311 F.3d 565, 569 (3d Cir. 2002).

The District Court, viewing Williams's actual limitation (*i.e.*, his inability to carry a firearm resulting from his severe depression) as one that "temporarily limit[ed] the jobs that were available to [him] to those jobs that do not require him to carry a firearm," Dist. Court Op. at 29, held that Williams was not precluded from performing a broad range of jobs, and therefore was not disabled within the meaning of the ADA. The District Court noted that Williams had testified at a deposition that he could have performed the duties of a bus driver, chauffeur, and tow truck operator, and could have worked for the public transportation agency SEPTA, a rental car agency, or in the radio room at PHA,

thereby not precluding him from performing work in a broad range of jobs.

We agree with the District Court that Williams's testimony establishes that he was not precluded from a "broad range of jobs" within the meaning of 29 C.F.R. § 1630.2(j)(3)(ii)(C). However, the regulations provide that one is substantially limited in the major life activity of working if one is significantly restricted in one's ability to perform "*either* a class of jobs *or* a broad range of jobs." 29 C.F.R. § 1630.2(j)(3)(i) (emphasis added). It is clear from the regulations that, even if one has the ability to perform a broad range of jobs, one is nevertheless disabled if one is significantly restricted in one's ability to perform most of the jobs in one's geographical area that utilize training, knowledge, skills and abilities similar to the job one has been disqualified from performing. The EEOC's Technical Assistance Manual, for example, refers to the following scenario as an example of being significantly restricted in one's ability to perform a "class of jobs:"

> A computer programmer develops a vision impairment that does not substantially limit her ability to see, but because of poor contrast is unable to distinguish print on computer screens. Her impairment prevents her from working as a computer operator, programmer, instructor, or systems

13

analyst. She is substantially limited in working, because her impairment prevents her from working in the class of jobs requiring use of a computer.

Equal Employment Opportunity Commission, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* II-7 (Jan. 1992) ("*Technical Assistance Manual*").

The District Court did not address whether Williams was significantly restricted in his ability to perform a *class* of jobs because of his depression and the resulting inability to carry a firearm. A critical question was thus left unanswered: Compared to an average person living in the same geographical region as Williams with similar training, knowledge, skills, and abilities, was Williams substantially restricted in his ability to perform jobs in law enforcement? We conclude that the record would permit a reasonable jury to conclude that he was.

Williams contends that his inability to carry a firearm precludes him from serving in most law enforcement jobs wherever located and therefore significantly restricts his ability to perform that class of jobs. While the record has not been fully developed on this issue, it does support that contention. PHA administrator John O'Brien testified in an affidavit that "[a]s of 1998, the only job assignment available in the PHA police department that did not require the use of a firearm was work in the PHA radio room." A202. Moreover, PHA has not challenged, for summary judgment purposes, that Williams was incapable of working in most law enforcement positions due to his inability to carry a gun. Instead, PHA argues that (1) "law enforcement" cannot constitute a "class" of jobs, and (2) Williams's inability to work with firearms was, in fact, temporary and, accordingly, not a "significant restriction."

PHA does not explain why law enforcement positions are not a "class of jobs" within the meaning of that phrase as used in the EEOC's regulations, and our reading of those regulations persuades us that the record would support a finding in favor of Williams on this issue. For example, assuming the jury were convinced that Williams's condition substantially restricts his ability to perform law enforcement jobs, it seems to us that Williams would be no less limited in the major life activity of working than the computer programmer referenced by the EEOC as being "substantially limited in working, because her impairment prevents her from working in the class of jobs requiring use of a computer." *Technical Assistance Manual* at II-7.

We reject the PHA's suggestion that *Sutton* teaches to the contrary. In *Sutton*, a group of myopic job applicants challenged an airline's minimum vision requirement for the job of "global airline pilot." The Supreme Court noted that this

14

position, global airline pilot, was a "single job" (and, in fact, was a position with one single employer), and did not preclude the group from pursuing "a number of other positions utilizing petitioners' skills, such as regional pilot and pilot instructor to name a few, [that] are available to them." *Sutton*, 527 U.S. at 493. The Court noted that under the Interpretative Guidance provided by the EEOC, "an individual who cannot be a commercial airline pilot because of a minor vision impairment, but who can be a commercial airline co-pilot or a pilot for a courier service, would not be substantially limited in the major life activity of working." *Id.*

In *Sutton*, petitioners could not be one type of pilot working for one particular employer, but could hold various other pilot jobs. Williams, on the other hand, could not work in most law enforcement positions so long as his condition persisted.

With respect to the expected duration of Williams's impairment, the record is not fully developed, but we conclude that there is enough evidence to permit resolution of the issue in Williams's favor. As a matter of law, a "transient, nonpermanent condition," *McDonald v. Commonwealth*, 62 F.3d 92, 94-97 (3d Cir. 1995), or "a temporary, non-chronic impairment of short duration," *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002), it is true, fall short of substantially limiting an individual in a major life activity. Accordingly, the EEOC has suggested, for example, that broken limbs, sprained joints, concussions,

appendicitis, and influenza, being impairments of a temporary nature "with little or no long term or permanent impact," cannot as a matter of law substantially limit an individual in a major life activity. *See* EEOC Interpretive Guidance, 29 C.F.R. Pt. 1630, App. § 1630.2(j). However, Williams does not need to show that his disability is permanent; instead, under the EEOC regulations, the "nature and severity" of Williams's impairment and its "duration or expected duration," along with the "permanent or long term impact" of that impairment, are factors to be considered in determining whether an individual is substantially limited in a major life activity. 29 C.F.R. § 1630.2(j)(2). Because an impairment and its impact may be less than permanent and still "significantly restrict" a person's ability to perform a class of jobs, the current record precludes summary judgment based on this issue.

Williams's medical record reflects that he was professionally diagnosed with "Major Depressive Disorder" as early as December of 1996, and that he was under continuing treatment for depression in the fall of 1999, more than a year after his termination. Examining clinicians on both sides agreed that, during the time in which Williams first took leave from PHA in the summer of 1998, Williams suffered from depression that required treatment over at least an indefinite period of time. Dr. Finley, PHA's psychologist, concluded that Williams "require[d] psychological treatment for depression and stress

15

management," A200, and indicated that his condition was severe enough to prevent him from carrying a firearm. Dr. Finley did not express an opinion as to the duration of Williams's impairment, but suggested that he might be "further helped by psychotropic medications," although further evaluation would be necessary to determine whether or not he could "resume active duty with the continuation of prescribed treatment." A200. Reevaluation after a period of three months would be required to provide a "more definite time frame" for his full return to active duty. A201. Helen Huffington, M.S.S., Williams's treating counselor at Delaware County Psychological Services, indicated that Williams suffered from "major depression," and further concluded that his condition was "recurrent [and] severe," A198, thereby suggesting that Williams's mental impairment was severe, would have a long-term impact, and was likely to persist. Williams's personal psychologist, Dr. Levitt, reached the same conclusion as Huffington, diagnosing Williams as suffering from recurrent and severe major depression. A519.

While Dr. Finley hoped that treatment would improve Williams's condition in the future, there was certainly no assurance that such would be the case.[8]

Moreover, given in this case the history of the disorder, the lack of such assurance, and the conclusions of Williams's treating

not resume active duty, involving his usual and normal work activities, unless he is under the proper care of medical and psychological personnel. He requires psychological treatment for depression and stress management. He also requires an evaluation by medical personnel to determine if he may be further helped by psychotropic medications. Sgt. Williams can resume working on alternate work assignments and should do so for a *minimum* period of 3 months in order to provide an initial opportunity for him to begin receiving benefits from *regular medicinal and/or psychological* treatment. He should be *reevaluated after this time in order to determine whether or not he can resume active duty with the continuation of prescribed treatment regiment for the management of his stress and depression.*

A200 (emphasis added).

---

[8]As we have noted, Dr. Finley wrote, in part, as follows:

It is my professional opinion that Sgt. Williams should

16

clinicians that his major depression was severe and recurrent, a reasonable jury could conclude that Williams's problem was not a temporary one, and would not be precluded from reaching a finding of actual disability.

### ii. "Regarded As" Disabled

While Dr. Finley, PHA's examining clinician, indicated that Williams was only limited in his ability to *carry* a firearm, the record is clear that PHA perceived Williams as being unable to have *access* to firearms and to be *around others* carrying firearms. As PHA Administrator O'Brien has testified,

> [a]t all relevant times, PHA assigned *armed police officers* to work in the PHA radio room. Anyone assigned to the radio room would have *access* to firearms. . . . PHA did not assign Sergeant Williams to he radio room . . . because. . . Sgt. Williams would have *access* to firearms in the radio room.

A202 (emphasis added). Williams argues that PHA wrongly perceived him as having these additional limitations, and thereby regarded him as being disabled.[9]

---

[9]In light of Dr. Finley's conclusion that Williams could be around others carrying firearms, there is, of course, a factual issue to be determined as to whether PHA's perception was accurate and reflected

"A person is 'regarded as' having a disability" if the person:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;

> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

> (3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

*Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3d Cir. 1999) (quoting 29 C.F.R. § 1630.2(l)). Here, Williams argues that PHA regarded him as having a limitation (*i.e.*, the inability to have access to or be

---

Williams's actual disability, which we will discuss *infra* with respect to whether Williams could have been accommodated. If PHA's perception was, in fact, accurate, a jury could still determine that Williams was disabled, but these additional limitations (*i.e.*, that he not have access to firearms or be around others carrying firearms) might prevent him from being a qualified individual, in that there may have been no way to accommodate such an individual at this employer police station.

17

around others carrying firearms) far greater than the actual limitation (*i.e.*, the inability to carry a firearm) that resulted from his mental impairment.[10]

We determined previously that a trier of fact could find Williams to be actually disabled based on the evidence suggesting that Williams's inability to carry a firearm significantly restricted his ability to perform law enforcement jobs. The additional limitations perceived by PHA, of course, only serve to further restrict the jobs Williams could perform in law enforcement. As Williams suggests, an inability to have access to or be around others carrying firearms would prevent him from serving in virtually all law enforcement positions. Williams has therefore sufficiently demonstrated that a trier of fact could determine that PHA regarded him as being substantially limited in the major life activity of working because of its perception that he could not hold any law enforcement position.

PHA argues, however, that Williams's "regarded as" disability claim must fail because it regarded him as

temporarily disabled for "90 days," even if his actual limitation was not temporary. In support of that proposition, PHA first suggests that Dr. Finley's reports would require a jury to conclude that PHA regarded Williams as disabled only for 90 days. While PHA heavily relies upon Dr. Finley's reports as the basis for its view of Williams's impairments, Dr. Finley's reports, as we have noted, indicate that it was not possible to provide "a more definite time frame . . . at this time [as to when Williams could carry a firearm], pending a reevaluation." A201. A reasonable juror could find that Dr. Finley's reports, as relied upon by PHA, establish that PHA viewed Williams as requiring ongoing treatment, and that PHA did not believe that a return to full duty was imminent.

PHA further looks to a memo from Assistant Chief of Operations Aaron Hughes to Williams dated October 20, 1998, in which Hughes indicated that "once you [Williams] have completed all of your treatment with Dr. Finley, releasing you to return to full duty, with authorization to carry firearms once again, you are to report back to uniform patrol duty." A204 (the "Hughes memorandum"). The Hughes memorandum required Williams to complete "all" of his treatment with Dr. Finley and receive her authorization to carry firearms before being allowed to return to "patrol duty." That memorandum was written ten days after Dr. Finley informed PHA that she had *not* been asked to treat Williams and would *not* "be

---

[10]Williams's position, that he was both actually disabled and wrongly regarded as disabled, is "[not] intrinsically contradictory, as he could have an impairment (whether or not it rose to the level of a disability) that could actually be accommodated, despite [his employer's] perception that his disability was too severe to accommodate." *Pathmark*, 177 F.3d at 189.

18

working with [Sergeant] Williams on an ongoing basis." A160. Given that PHA had been informed by Dr. Finley that no such treatment with her was planned, it is difficult to see how a reasonable juror, reading the Hughes memorandum and its requirement that Williams receive treatment from Dr. Finley, would have to conclude that PHA was determined to allow Williams to return to work in 90 days. Moreover, in light of the memorandum's requirement that Williams receive medical clearance to carry firearms before returning to PHA, a reasonable juror could determine that PHA perceived Williams's impairment to be of an unknown and potentially unlimited determination.[11]

---

[11]PHA further relies upon an affidavit submitted by PHA Administrator O'Brien indicating that PHA offered Williams a "leave of absence that would have allowed him to return to work as a police sergeant within 90 days." A202. This would apparently be the basis for PHA's argument that they perceived Williams as able to return to work in 90 days. However, the affidavit conflicts on its face with the Hughes memorandum, which indicated that Williams would only be allowed to return to work upon completion of treatment with the employer's psychologist–treatment that the employer's psychologist never agreed to perform–and upon receiving clearance from the employer's psychologist to carry firearms. While a jury might believe O'Brien's testimony, the record certainly does not

We thus conclude that there is a material dispute of fact both as to whether Williams was actually disabled in the summer of 1998 and as to whether he was regarded by PHA as being disabled.

## B. Qualified Status

The second element of Williams's *prima facie* case of discrimination under the ADA requires him to show that he is a "qualified individual." *See Deane*, 142 F.3d at 145. As previously noted, a qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "[A] disabled employee may establish a *prima facie* case under the ADA if s/he shows that s/he can perform the essential functions of the job with reasonable accommodation and that the employer refused to make such an accommodation." *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001).

Under the ADA, a "reasonable accommodation" includes "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). However, the EEOC's commentary to its regulations provides that reassignment "should be considered only when accommodation within the individual's current position would pose an undue hardship." EEOC Interpretive Guidance, 29 C.F.R. Pt. 1630, App. § 1630.2(o). Neither party has suggested that any accommodation within Williams's

---

compel such a conclusion.

current position would have been possible in this case.

Williams first asked to be reassigned to PHA's training unit. PHA responded to Williams: "the specific position that you are requesting is not open to you due to your on-going treatment with Dr. Lauren Finley. . . and her recommendation that you should not carry a weapon while still under her care for the next several months." A204. Williams then responded by requesting a radio room assignment. PHA did not directly respond to this request until litigation.

It is Williams's position that with the benefit of an accommodation transfer he would have been able to perform the essential functions of a member of the radio room or the training unit. With respect to the radio room, both sides agree that, absent his inability to carry a firearm, Williams was qualified for that position. Indeed, PHA assigned him to that position prior to receiving Dr. Finley's report and concluding that he could not be around others carrying, or have access to, firearms. Assuming a reasonable jury concludes that Williams's actual limitation consisted of an inability to carry firearms, there is nothing in the record to suggest that Williams could not function in the radio room without carrying a firearm. In any event, PHA has not challenged, for summary judgment purposes, that Williams could have worked in the radio room without *carrying* a firearm, and that vacant, funded radio room positions were available.

PHA insists, however, that Williams was not qualified to work in the radio room because he was not only unable to carry a firearm, but was, in fact, also unable to have access to firearms or be around others who carried firearms. Concededly, a radio room assignment would have allowed Williams to have access to firearms or to be around others who carried firearms. This argument cannot succeed at the summary judgment stage, however, because PHA's own doctor's report supports the view that Williams's condition did not preclude him from working with people who carried weapons. Dr. Finley specifically concluded that Williams "can work around other officers who will be wearing their weapon." A201. A reasonable jury could thus conclude that Williams's actual limitations left him qualified to do radio room work.[12]

To the extent Williams relies upon a "regarded as" theory of disability, PHA contends that a plaintiff in Williams's position must show that there were vacant, funded positions whose essential functions

_____

[12]Given PHA's denial of Williams's request for a transfer to the training unit based solely on Dr. Finley's report, a reasonable jury could also conclude that, absent the inability to carry a weapon, Williams was otherwise qualified to serve in the training unit. Based on the extent of Williams's service with the PHA, we believe a reasonable jury could infer that his service in the training unit would not necessarily require carrying a firearm.

the employee was capable of performing *in the eyes of the employer who misperceived the employee's limitations*.[13] Even if a trier of fact concludes that PHA *wrongly* perceived Williams's limitations to be so severe as to prevent him from performing *any* law enforcement job, the "regarded as" claim must, in PHA's view, fail because Williams has been unable to demonstrate the existence of a vacant, funded position at PHA whose functions he was capable of performing in light of its misperception. Williams could not have been a "qualified individual" under the ADA, PHA suggests, because there were *no* jobs at this employer police station he could have performed given its misperception that he could not be around others carrying, or have access to, firearms. We reject this suggestion.

"[O]ne of the points of 'regarded as' protection is that employers cannot misinterpret information about an employee's limitations to conclude that the employee is incapable of performing a wide range [or class] of jobs." *Pathmark*, 177 F.3d at 190. PHA's argument, if accepted, would make "regarded as" protection meaningless. An employer could simply regard an employee as incapable of performing *any* work, and an

employee's "regarded as" failure to accommodate claim would always fail, under PHA's theory, because the employee would never be able to demonstrate the existence of any vacant, funded positions he or she was capable of performing in the eyes of the employer.

*Pathmark* soundly rejects an argument similar to that here made by PHA. There, an employer received a medical report indicating that an employee would have a significant "*temporary*" impairment, and the employer misperceived the report, indicating to the employee that it had "been advised your restrictions are *permanent*," *id.* at 184 (emphasis added). Viewing the employee as suffering from severe, permanent limitations as a result of what was in fact a temporary impairment, the employer supermarket concluded that the worker "was unable to perform *any* Pathmark job, even with accommodation," *id.* at 188, and fired the worker.

We agreed with the employee "that, in general, an employer's perception that an employee cannot perform a wide range [or class] of jobs suffices to make out a 'regarded as' claim." *Id.* at 188. We held that, with respect to the employee's "regarded as" claim, the employer would be "liable if it wrongly regarded [the employee] as so disabled that he could not work and therefore denied him a job." *Id.* at 190. Anticipating PHA's challenge here, we held that "[i]f an employer believes that a perceived disability inherently precludes successful performance of the essential functions of a

---

[13]We assume for present purposes that a jury determines that Williams's actual limitation was an inability to carry firearms, and that PHA misperceived Williams's limitations when it concluded that he was unable to have access to, or be around others carrying, firearms.

21

job, with or without accommodation, the employer must be correct about the affected employee's ability to perform the job in order to avoid liability." *Id.* at 193.[14]   Thus, contrary to PHA's

suggestion, a "regarded as" disabled employee need not demonstrate during litigation the availability of a position he or she was capable of performing in the eyes of the misperceiving employer.

To meet his litigation burden with respect to both his "actual" and "regarded as" disability claims, Williams need only show

> (1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with reasonable accommodation.   If the employee meets his burden, the employer must demonstrate that

---

[14]We also noted that "the law in this circuit is that a 'regarded as' plaintiff can make out a case [even] if the employer is innocently wrong about the extent of his or her impairment," *id.* at 191, meaning that there is no general "good faith" defense available to PHA to the extent it misperceived Williams as having an impairment that substantially limits a major life activity based upon myths, fears, or stereotypes associated with disabilities.

There is, however, a limited defense available to employers who engage in an "individualized determination of the employee's actual condition" and develop a misperception "based on the employee's unreasonable actions or omissions." *Id.* at 193.   Assuming a jury determines that PHA misperceived Williams as being unable to have access to, or be around others carrying, firearms, the existence of such a defense in this case would also be a question for a jury, given that PHA retained such a misperception despite clarification from Dr. Finley that Williams could be around others carrying firearms and a communication from Williams requesting a radio room assignment in light of his having been cleared for such an assignment by Dr. Finley.

Of course, while "an employer's innocent mistake (which may be a function of 'goofs' or miscommunications) is

---

sufficient to subject it to liability under the ADA," the "employer's state of mind [remains] relevant to the appropriate remedies." *Id.* at 182-83 (citation omitted); *see* 42 U.S.C. 1981a(a)(3) (where "discriminatory practice involves the provision of a reasonable accommodation," "damages may not be awarded . . . where the covered entity demonstrates good faith efforts, in consultation with [employee], to identify and make a reasonable accommodation"); *see also Deane*, 142 F.3d at 148 n.12 ("regarded as" plaintiff "might be entitled to injunctive relief against future discrimination").

22

transferring the employee would cause unreasonable hardship.

*Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000). Williams alleges, and the record supports a finding, that a radio room assignment was available, that the position was at or below his level, and that he was qualified to perform the essential duties of that job with no further accommodation. Thus, Williams has established that there is a material dispute of fact as to whether he was a qualified individual under the ADA.[15]

[15]We are, of course, aware that "an employer is not required to provide a reasonable accommodation if it . . . would pose a 'direct threat' to the safety of the employee or others, 29 C.F.R. § 1630.15(b)(2), *see Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, [78-79], 122 S.Ct. 2045, 2049, 153 L.Ed.2d 82 (2002)." *Buskirk v. Apollo Metals*, 307 F.3d 160, 168 (3d Cir. 2002); *see also* 29 C.F.R. § 1630.2(r) (defining "direct threat"). PHA has not argued, for summary judgment purposes, that Williams was not entitled to reasonable accommodation under the "direct threat" exemption, and has instead focused its efforts on whether Williams was disabled and/or a qualified individual.

Having concluded that there is a material dispute of fact as to whether Williams was disabled and a qualified individual, we mention the "direct threat" exemption here only to make clear that the ADA is not unsympathetic to employers

### C. Adverse Employment Action Resulting From Discrimination

As we have noted, a failure to make a reasonable accommodation for a disabled and qualified employee constitutes discrimination under the ADA. *Taylor*, 184 F.3d at 306. Williams claims that PHA failed to make such an accommodation when it refused his requests for assignment to the radio room and the training unit. In addition to insisting that Williams was not disabled, PHA seems to suggest that it offered to reasonably accommodate Williams by offering him an unpaid leave of absence and future employment should he recover. "[T]he question of whether a proposed accommodation is reasonable is a question of fact." *Buskirk*, 307 F.3d at 170; *see also Skerski*, 257 F.3d at 286; *cf. Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 671 (3d Cir. 1999) ("unpaid leave supplementing regular sick and personal days might, under [some] facts, represent a reasonable accommodation"). If a trier of fact concludes that Williams was disabled, however, it could also find that the failure to continue Williams' paid employment as a member of the radio or training unit was a failure to reasonably

faced with an employee who truly poses a "direct threat" to workplace safety. Here, of course, there is a triable issue of fact as to whether Williams posed such a "direct threat," given that PHA's refusal to allow Williams to work around others with firearms was contrary to the conclusion of its own clinician.

accommodate and accordingly constituted an adverse employment action under the ADA.

Additionally, we have repeatedly held that an employer has a duty under the ADA to engage in an "interactive process" of communication with an employee requesting an accommodation so that the employer will be able to ascertain whether there is in fact a disability and, if so, the extent thereof, and thereafter be able to assist in identifying reasonable accommodations where appropriate. "The ADA itself does not refer to the interactive process," but does require employers to "make reasonable accommodations" under some circumstances for qualified individuals. *Shapiro v. Township of Lakewood*, 292 F.3d 356, 359 (3d Cir. 2002) (internal quotation marks and alterations omitted). With respect to what consists of a "reasonable accommodation," EEOC regulations indicate that,

> [t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). Further,

> The EEOC's interpretive guidelines establish the circumstances that trigger the employer's duty to engage in this interactive process: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability."

*Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000) (quoting 29 C.F.R. Pt. 1630, App. § 1630.9).

Accordingly, we have held that both employer and employee "have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Mengine*, 114 F.3d at 420 (discussing the duty in the context of the Rehabilitation Act). An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that:

1) the employer knew about

24

> the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Taylor*, 184 F.3d at 319-20. However, in addressing an employee's claim that an employer failed to engage in the interactive process, we have also made clear that a "plaintiff in a disability discrimination case who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover without showing that a reasonable accommodation was possible." *Donahue*, 224 F.3d at 234. Thus, "'because employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable *if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations*.'" *Id.* at 234-35 (quoting *Taylor*, 184 F.3d at 317) (emphasis in original).

Under *Taylor*, Williams has demonstrated that a fact-finder could conclude that PHA knew about his disability, that he requested accommodation, that PHA's quite limited response to his training unit assignment request was not made in good faith, that PHA's offer of extended unpaid leave was not a good faith response to his request for a radio room assignment, and that Williams could have been reasonably accommodated with a radio room or training unit assignment but for PHA's lack of good faith. Thus, a material dispute of fact exists as to whether PHA failed to engage in good faith in the interactive process, thereby failing to reasonably accommodate Williams.[16]

---

[16]Our admonition *en banc* in *Deane* that employers take seriously the interactive process rings true in this case. There, we noted that a single phone call between an employer and an employee "hardly satisfies our standard that the employer make reasonable efforts to assist the employee, to communicate with him in good faith, and to not impede his investigation for employment." *Deane*, 142 F.3d at 149. PHA's initial response to Williams's request for a training unit assignment did little to meet its obligation to interact in good faith. *Compare* A204 ("it is the position of this police department that the specific position that you are requesting is not open to you due to your on-going treatment with Dr. Lauren Finley. . . and her recommendation that you should not carry a weapon while still under her care for the next several months.") *with Taylor*, 184 F.3d at 317

25

To the extent Williams relies upon a claim that PHA perceived his impairment to be greater than it was, PHA advances an additional argument. It insists that a "regarded as" disabled employee is not entitled to accommodation under the ADA and that, accordingly, Williams suffered no adverse employment action other than his termination.[17] This presents an issue that is one of first impression in this Circuit and has occasioned a circuit split elsewhere. We assume for purposes of our analysis that the trier of fact will find erroneous PHA's perception that Williams's depression prevented him from being around others carrying, or having access to, guns.

Based on the statutory text and the legislative history of the ADA, the First Circuit Court of Appeals has held that a "regarded as" disabled employee is entitled to be accommodated. *Katz v. City Metal Co.*, 87 F.3d 26, 33 (1st Cir. 1996). The better-reasoned district court decisions reach the same result. *See Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151, 163-71 (E.D.N.Y. 2002); *Jewell v. Reid's Confectionary Co.*, 172 F. Supp. 2d 212, 218-19 (D. Me. 2001); *see also Lorinz v. Turner Const. Co.*, 2004 WL 1196699, *8 n.7 (E.D.N.Y. May 25, 2004) (endorsing *Jacques*); *Miller v. Heritage Prod., Inc.*, 2004 WL 1087370, *10 (S.D. Ind. Apr. 21, 2004) (same). We also find Judge Block's

---

("Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome").

PHA's subsequent failure to respond to Williams's request for a radio room assignment further subjected it to the risk that it overlooked an opportunity to accommodate a statutorily disabled employee. *See Taylor*, 184 F.3d at 317 ("[A]n employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA.").

[17]Even if we were to agree with PHA that "regarded as" disabled individuals are not entitled to reasonable accommodations under the ADA, we note that we would

---

nonetheless be required to remand this matter for further proceedings based upon the existence of a material dispute of fact with respect to Williams's actual disability. If a jury finds Williams to have been actually disabled because his depression deprived him of the ability to carry a firearm, as we discuss *supra* note 14, liability could be imposed even though PHA denied his requests for accommodation based on its misperception regarding the extent of Williams's impairment.

analysis in *Jacques* particularly persuasive, and will largely track his approach below.

As PHA stresses, however, there are two Courts of Appeals who have reasoned to a contrary conclusion, *see Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1231-33 (9th Cir. 2003); *Weber v. Strippit, Inc.*, 186 F.3d 907, 916-17 (8th Cir. 1999), and two have so concluded without analysis, *see Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999); *Newberry v. East Texas State University*, 161 F.3d 276, 280 (5th Cir. 1998).[18] We find ourselves unpersuaded by the reasoning of *Weber* and *Kaplan*.

*Weber* acknowledged that the statutory text did not distinguish between actually and "regarded as" disabled employees. It declined to apply the statute as written, however, because doing so, in its view, "would lead to bizarre results." 186 F.3d at 916. In so concluding, it declined to attribute to Congress an intent "to create a disparity among impaired but non-disabled employees, denying most the right to reasonable accommodations but granting to others, because of the employers' misperceptions, a right to reasonable accommodations. . . ." *Id.* at

---

[18]Three Circuit Courts, including our own, have thus far considered but declined to address the issue. *See Cameron v. Cmty. Aid For Retarded Children, Inc.*, 335 F.3d 60, 64 (2d Cir. 2003); *Mack v. Great Dane Trailers*, 308 F.3d 776, 783 n.2 (7th Cir. 2002); *Buskirk*, 307 F.3d at 168-69 & n.2.

917. In *Kaplan*, the Court of Appeals for the Ninth Circuit, despite finding that "on its face, the ADA's definition of 'qualified individual with a disability' does not differentiate between the three alternative prongs of the 'disability definition,'" 323 F.3d at 1232, adopted the rationale of *Weber*, again suggesting that a "formalistic reading" of the ADA would lead to "bizarre results." *Id.* Specifically, *Kaplan* endorsed the "windfall theory" suggested in a dictum by our Court: "it seems odd to give an impaired but not disabled person a windfall because of her employer's erroneous perception of disability, when other impaired but not disabled people are not entitled to accommodation." *Pathmark*, 177 F.3d at 196 (citing *Deane*, 142 F.3d at 149 n.12).

While we do not rule out the possibility that there may be situations in which applying the reasonable accommodation requirement in favor of a "regarded as" disabled employee would produce "bizarre results," we perceive no basis for an across-the-board refusal to apply the ADA in accordance with the plain meaning of its text. Here, and in what seem to us to be at least the vast majority of cases, a literal reading of the Act will not produce such results. Accordingly, we will remain faithful to its directive in this case.

A. The Plain Language of the ADA

As we have heretofore explained, the ADA makes it unlawful for a covered employer to "discriminate against a qualified individual with a disability

because of the disability," 42 U.S.C. § 12112(a), and "discrimination" in this context includes, with an exception not here relevant, "not making reasonable accommodation to the . . . mental limitations of an otherwise qualified individual with a disability," 42 U.S.C. § 12112(b)(5)(A). The definition of "disability" includes "*being regarded as having . . . an impairment*" that substantially limits a major life activity. 42 U.S.C. § 12102(2)(C) (emphasis added). Thus, as all would agree, the statutory text of the ADA does not in any way "distinguish between [actually] disabled and 'regarded as' individuals in requiring accommodation." *Pathmark*, 177 F.3d at 196.

### B. The Legislative History

Moreover, the legislative history of the ADA confirms that Congress meant what its text says. As Congress explained:

> [The objective of the "regarded as" provision of the ADA] was articulated by the Supreme Court in *School Board of Nassau County v. Arline*. The Court noted that although an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as disabling. "Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment."
>
> The Court concluded that, by including this test, "Congress acknowledged accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment."
>
> Thus, a person who [suffers an adverse employment action] because of the myths, fears and stereotypes associated with disabilities would be covered under [the "regarded as" prong], whether or not the employer's perception was shared by others in the field and whether or not the person's physical or mental condition would be considered a disability under the first or second part of the definition.

H.R. Rep. No. 101-485 (III), 1990 U.S.C.C.A.N. 445, 453 (footnotes omitted). Thus, the ADA was written to protect one who is "disabled" by virtue of being "regarded as" disabled in the same way as one who is "disabled" by virtue of

being "actually disabled," because being perceived as disabled "may prove just as disabling." This case demonstrates the wisdom of that conclusion, in that but for PHA's erroneous perception that Williams was unable to be around firearms because of his mental impairment, Williams would have been eligible for a radio room assignment.

### C. The Supreme Court's Decision in *Arline*

In addition to the statutory text and legislative history, the Supreme Court's decision in *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987), also requires that "regarded as" employees be entitled to reasonable accommodations. *Arline* involved a claim based on the Rehabilitation Act. The Court pointed out that the Act's definition of "handicapped individual" had been amended to read as follows:

> [A]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

*Arline*, 480 U.S. at 279. The Court explained that this expansion of the definition was intended "to preclude discrimination against '[a] person who has a record of, or is regarded as having, an impairment [but who] may at present have

no actual incapacity at all.'" *Arline*, 480 U.S. at 279 (quoting *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 405-406 n.6 (1979)) (alterations in original). The Court held that the teacher plaintiff, who had a contagious but not substantially limiting form of tuberculosis, fell into this category. It found that employers had "an affirmative obligation [under the Rehabilitation Act] to make a reasonable accommodation" for such an employee, *Arline*, 480 U.S. at 289 n.19, and remanded so that the District Court could determine "whether the School Board could have reasonably accommodated her," *id.* at 288-89.

Given that the "regarded as" sections of both Acts play a virtually identical role in the statutory scheme, and the well-established rule that the ADA must be read "to grant at least as much protection as provided by . . . the Rehabilitation Act," *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998), the conclusion seems inescapable that "regarded as" employees under the ADA are entitled to reasonable accommodation in the same way as are those who are actually disabled. Of course, additionally, Congress specifically endorsed the *Arline* approach in crafting the "regarded as" prong of the ADA's definition of "disability." Neither the Eighth Circuit's decision in *Weber* nor the Ninth Circuit's decision in *Kaplan* address *Arline*.

### D. The "Windfall" Proposition

PHA, arguing the windfall theory to our Court, suggests that Williams, by

29

being "regarded as" disabled by PHA, receives a "windfall" accommodation compared to a similarly situated employee who had not been "regarded as" disabled and would not be entitled under the ADA to any accommodation. The record in this case demonstrates that, absent PHA's erroneous perception that Williams could not be around firearms because of his mental impairment, a radio room assignment would have been made available to him and others similarly situated. PHA refused to provide that assignment solely based upon its erroneous perception that Williams's mental impairment prevented him not only from carrying a gun, but being around others with, or having access to, guns – perceptions specifically contradicted by PHA's own psychologist. While a similarly situated employee who was not perceived to have this additional limitation would have been allowed a radio room assignment, Williams was specifically denied such an assignment because of the erroneous perception of his disability. The employee whose limitations are perceived accurately gets to work, while Williams is sent home unpaid. This is precisely the type of discrimination the "regarded as" prong literally protects from, as confirmed by the Supreme Court's decision in *Arline* and the legislative history of the ADA. Accordingly, Williams, to the extent PHA regarded him as disabled, was entitled to reasonable accommodation.[19]

---

[19]In many cases where an employer regards an employee as having limitations that the employee did not have or limitations greater than the employee's actual limitations, a simple reasonable accommodation can be devised to allow the employee to continue working even given the employer's misperception. In such cases, it may be that the employer and employee never reach a meeting of the minds, regardless of who was at fault for failing to do so, as to the employee's actual limitations. Nonetheless, the employee can still be reasonably accommodated such that he or she can perform the essential functions of the position even in light of the employer's misperception. For example, an employer supermarket requires all of its cashiers to stand. One cashier has a back problem that causes discomfort but does not amount to an actual disability. The employer misperceives this back problem as one that prevents the employee from standing for more than an hour, and fires the employee because she cannot stand. Even if the supermarket and cashier never reach a meeting of the minds as to the true extent of the cashier's limitations, the supermarket might, assuming its erroneous perception amounted to a substantial limitation of a major life activity, be required to reasonably accommodate such a "regarded as" disabled employee by, for example, providing a stool.

In our case, it is true that PHA perceived Williams's limitations to be so extensive that no simple solution, such as a stool, would have allowed Williams to keep working while their misperception

30

For the foregoing reasons, we will reverse and remand the District Court's grant of summary judgment in favor of PHA with respect to Williams's ADA and PHRA discrimination claims. We will affirm the District Court's summary judgment determination with respect to Williams's retaliation claims and with respect to Williams's cross-motion for

persisted. Thus, it was critical that PHA engage in good faith in the interactive process and determine the actual extent of Williams's limitations before simply deeming him unable to work, contrary to the opinion of their own psychologist. Instead, as we have indicated, PHA's response (or lack thereof) to Williams's disability has created a material dispute of fact as to whether it failed to engage in good faith in the interactive process. Assuming a jury determines that PHA's perception was inaccurate and that it regarded Williams as disabled, it is PHA's insistence on this erroneous perception and failure to discuss with Williams the true extent of his actual limitations that, as we have explained, potentially amounts to a failure to engage in the interactive process and, thereby, a failure to reasonably accommodate. Accordingly, even where an employer mistakenly regards an employee as so disabled that the employee cannot work at all, the employer still must accommodate a "regarded as" employee by seeking to determine, in good faith, the extent of the employee's actual limitations.

summary judgment.[20]

---

[20]Williams also appeals the District Court's denial of partial summary judgment in his favor with respect to whether he is disabled, whether PHA breached its duty to engage in the interactive process, and whether PHA failed to provide Williams with a reasonable accommodation. Williams argues, *inter alia*, that PHA "admitted" he was disabled within the meaning of the ADA by offering him the opportunity to take an unpaid leave of absence, thereby "accommodating" him.

We agree with the Sixth and Ninth Circuits, however, that an offer of accommodation does not, by itself, establish that an employer "regarded" an employee as disabled. *See Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 798 (9th Cir. 2001) ("[W]hen an employer takes steps to accommodate an employee's restrictions, it is not thereby conceding that the employee is disabled under the ADA or that it regards the employee as disabled. A contrary rule would discourage the amicable resolution of numerous employment disputes and needlessly force parties into expensive and time-consuming litigation."), *clarified in other respects*, 292 F.3d 1045 (9th Cir. 2002); *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000) ("The intent behind this ["regarded as"] provision, according to the EEOC, is to reach those cases in which 'myths, fears and stereotypes' affect the employer's treatment of an individual. [An employee]

cannot show that this provision applies to him merely by pointing to that portion of the record in which his [employer] admitted that he was aware of [the employee's] medical restrictions and modified [the employee's] responsibilities based on them.").

Williams further argues that there is no material dispute of fact with respect to all of the preceding issues. However, as we have indicated, there are factual determinations to be made with respect to each of these issues.