Sally J. SHELLENBERGER, Appellant

v.

SUMMIT BANCORP, INC.

No. 01–1215.

United States Court of Appeals,
Third Circuit.

Argued: May 23, 2002.

Filed: Jan. 23, 2003.

retaliation claim. She also claims that her request for accommodation was protected activity under the ADA and that a jury could reasonably conclude that Summit terminated her employment because of that protected activity in violation of the ADA. Shellenberger has not, however, appealed the district court's grant of Summit's Rule 50 motion on her claim of disability itself. Accordingly, we need not consider whether the district court erred in concluding that Shellenberger failed to establish that she was disabled as a matter of law. For the reasons that follow, we will reverse and remand for a new trial on her retaliation claims.

Kimberly D. Borland (Argued), Wilkes Barre, PA, for Appellant.

Gary W. Flanagan (Argued), Edwards & Angell, LLP, Providence, PA, for Appellee.

Before McKEE, STAPLETON, and WALLACE,* Circuit Judges.

## OPINION OF THE COURT

McKEE, Circuit Judge.

Sally Shellenberger appeals the district court's grant of a motion for judgment as a matter of law under Fed.R.Civ.P. 50 that Summit Bancorp ("Summit") made during the jury trial of the suit Shellenberger brought under the Americans with Disabilities Act ("ADA"). Shellenberger claimed that Summit's termination of her employment was illegal disability discrimination, and retaliation for activity that is protected under the ADA. On appeal, Shellenberger argues that the district court erred in granting Summit's Rule 50 motion on her

## I. Facts

Sally Shellenberger began her employment with Summit in January 1997 as a Customer Service Representative at Summit's call center in Bethlehem, Pennsylvania. She had an extensive history of seasonal allergies, and she was taking medication when she began her employment.

Nine months after she began working at Summit, she started complaining to management that she was experiencing adverse physical reactions to various fragrances in the work environment. On September 6, 1997, Shellenberger complained to Jane Fungard, the Site Manager, and told her that she (Shellenberger) was experiencing nausea and allergy-like symptoms from a co-worker's perfume. Fungard allowed Shellenberger to move her seat. Nine days later, Shellenberger again complained to Fungard about symptoms triggered by a fragrance another co-worker was wearing, and Fungard again allowed Shellenberger to move her seat. Shellenberger also asked permission to

---

* Honorable J. Clifford Wallace, Senior Circuit Judge, United States Court of Appeals for the    Ninth Circuit, sitting by designation.

"sniff" new employees who may be stationed next to her. Not surprisingly, Fungard denied that request.

The following month, Shellenberger complained about a fragrance worn by another co-worker, and Shellenberger was allowed to place a fan at her desk. That same day, Shellenberger met with Fungard, Tracy Resetar, a human resources representative, and Alice Ruiz, who was on Summit's employee relations staff. During that meeting Shellenberger was told that she would be allowed to move her desk to the north side of the building. However, she was also warned that her desk would not be moved again except for Summit's own business reasons. Around this time, Shellenberger also told a supervisor, Angela Diadordo, not to approach her because a fragrance Diadordo was wearing bothered Shellenberger. Diadordo complied with that request, and called Shellenberger on the phone to discuss business matters rather than discuss them with her in person.

Shellenberger eventually consulted Dr. Harold Buttram, who concluded that Shellenberger was suffering from "toxic encephalopathy," that she was hyper-sensitive to common chemicals and fragrances in the workplace, and that she suffered allergy-like symptoms when she came in contact with them. The substances she reacted to included: scented hand creams, deodorants, cleaning chemicals, "white-out," plug-in room deodorizers, carbonless paper, felt tip markers, some carpeting, and hair relaxers.

On November 7, 1997, Dr. Buttram wrote to Carl Johnson, the Vice President and EEO Compliance Officer for Summit. Dr. Buttram asked Summit to make some accommodations for Shellenberger's condition. Johnson did not reply. Instead, Dr. Buttram received a letter from James Kreig, counsel for Summit. The two exchanged letters regarding Shellenberger's sensitivities beginning on November 20, 1997, and lasting through February of the next year. Despite that correspondence, they were unable to reach any mutually satisfactory resolution for Shellenberger. Dr. Buttram also wrote two other letters on Shellenberger's behalf in August and September of 1998, but the matter remained unresolved.

Shellenberger left work early three times in November 1997 and once in March 1998 due to discomfort she was experiencing from fragrances in the workplace. She was never disciplined for any of those early departures. On April 22, 1998, Shellenberger experienced symptoms from the lemon-scented furniture polish in the room where she was receiving training. Summit managers allowed her to leave training early and reschedule her training session.

In August 1998, Shellenberger was paired with a new trainee during a two week "buddy system" orientation. Shellenberger apparently had a reaction to the trainee's perfume and asked her to stop wearing it. The trainee complied with the request. However, Shellenberger later complained that some fragrance in a skin lotion the trainee was wearing irritated her. Summit responded by allowing Shellenberger two weeks paid absence until the "buddy system" orientation was finished.[1]

Around January of 1998, Shellenberger began communicating with the EEOC regarding the conditions of her employment at Summit, and she filed an EEOC complaint against Summit in July of that year.

---

1. Shellenberger began wearing a charcoal mask in the workplace around this time. Her supervisors apparently did not object.

In that complaint, Shellenberger alleged that she was disabled under the ADA and that Summit had failed to accommodate her disability. Summit was served with notice of Shellenberger's complaint on August 17, 1998.

On September 10, 1998 (a few weeks after receiving the EEOC complaint), Shellenberger met with Fungard and one of Shellenberger's supervisors to discuss possible accommodations. Shellenberger claims that she inquired about the possibility of Summit adopting a perfume-free policy in the workplace or giving her an enclosed cubicle with a special air filtration device. Shellenberger also claims that Fungard responded: "I know that you're taking the legal route, so you probably just want to consider–just continue in that vein." App. 67. According to Shellenberger, all discussion of possible accommodations stopped after that comment, and the meeting ended. Summit's account of the meeting is different. Summit contends that Shellenberger was insubordinate, accused Summit of "poisoning" her, and framed her request for accommodations as an ultimatum rather than an inquiry or request.

On September 23, 1998, Shellenberger was called into Resetar's office for a meeting, which Fungard also attended. It was at that meeting that Shellenberger was told she was being fired. Shellenberger claims that Resetar explained that she was being fired because "[w]e can't get along with you or we—we just can't work out our relationship with you." App. at 69. When asked if her termination had anything to do with her ability to get along with co-workers, Shellenberger claims that Resetar responded, ". . . no, no, no. It has nothing to do with that. We just can't

work things out with you." *Id.* When asked if she was being terminated due to her disability, Resetar responded, ". . . according to the bank's attorneys, you do not have a disability." *Id.* at 70.

After her termination, Shellenberger filed a second complaint with the EEOC, this time alleging illegal retaliatory discharge under the ADA. After an investigation, the EEOC concluded that Shellenberger had established both her failure to accommodate claim and her retaliatory discharge claim, and Shellenberger subsequently sued Summit under the ADA in district court.

During the ensuing jury trial, Shellenberger attempted to prove both a "pretext" case and a "mixed-motives" case under the ADA. At the conclusion of her evidence, the court granted Summit's Rule 50 motion for judgment as a matter of law as to Shellenberger's disability discrimination claim and her retaliatory discharge claim. This appeal followed.[2] As noted at the outset, Shellenberger is only appealing the judgment dismissing her retaliation claim.

## II. Discussion

■ Our review of a district court's ruling on a motion for a new trial pursuant to Fed.R.Civ.P. 50 is plenary. *See Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 88 (3d Cir.2000); *Alexander v. Univ. of Pittsburgh Med. Ctr. Sys.*, 185 F.3d 141, 145 (3d Cir.1999). Thus, we must interpret all evidence in the light most favorable to Shellenberger, the non-moving party. Judgment as a matter of law is appropriate only if the evidence so interpreted does not allow a reasonable jury to find in Shellenberger's favor on her

---

**2.** The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

claim of illegal retaliation for engaging in a protected activity under the ADA. *See Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 262 (3d Cir.1995); *see also* Fed.R.Civ.P. 50.

### A.

Shellenberger claims that Summit violated the ADA by terminating her employment in retaliation for her requesting an accommodation under the ADA and filing a complaint with the EEOC. The district court analyzed her claim solely under a "pretext" theory, and found that Shellenberger had not presented sufficient evidence as a matter of law to establish a causal connection between engaging in protected activity and Summit's decision to fire her. The court also ruled that, regardless of whether Shellenberger had established a causal connection, Summit had put forth a legitimate, non-discriminatory reason for firing her: that she was insubordinate.

The evidentiary framework of Shellenberger's claim will vary depending on whether the suit is characterized as a "pretext" suit or a "mixed-motives" suit.[3] Shellenberger argues that her evidence was sufficient to survive judgment as a matter of law under either theory, and we agree.[4]

A "pretext" claim of illegal retaliation follows the familiar burden shifting analysis of Title VII claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[5] Thus, in order to prevail under a "pretext" theory of illegal retaliation "a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). If the plaintiff is able to establish these elements of his/her *prima facie* case, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." *Id.* If the employer satisfies that burden, the plaintiff must then prove that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Id.* at 501.

"[B]y contrast, we have held that [in order to prevail under a 'mixed-motives' theory] a plaintiff need only show that the unlawful motive was a 'substantial motivating factor' in the adverse employment action." *Watson v. Southeastern Pennsylvania Transp. Auth.*, 207 F.3d 207, 215 (3d

---

**3.** *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1997).

**4.** Referring to these theories as though they embodied two *distinct* kinds of illegal conduct, or that they encompass two mutually exclusive legal theories is as troublesome as it is misleading. *See Watson v. Southeastern Pennsylvania Transp. Auth.*, 207 F.3d 207, 215, n. 5 (3d Cir.2000) ("The 'pretext' and 'mixed-motive' labels are misleading.... Nevertheless, we use the terms ... because they are familiar and the introduction of new terminology might lead to even greater confusion.") (citations omitted). Nevertheless, as

we did in *Watson*, we will use those terms here because of their familiarity and the extent to which they are now woven into the fabric of the jurisprudence of discrimination.

**5.** While the burden of proof may shift, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Shaner v. Synthes*, 204 F.3d 494, 500–01 (3d Cir.2000), *quoting Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Cir.2000) (discussing the mixed-motive and pretext theories at length).

At the outset of our discussion, we note that Shellenberger's failure to establish that she was disabled does not prevent her from recovering if she can establish that her employer terminated her because she engaged in activity protected under the ADA. In *Krouse*, we stated: "We hold that a person's status as a 'qualified individual with a disability' [under the ADA] is not relevant in assessing the person's claim for retaliation under the ADA." *Krouse*, 126 F.3d at 498.

That conclusion follows inexorably from the unambiguous text of the ADA. The Act not only applies to those who are protected because they are "disabled" as defined therein. It also "protects *'any individual'* who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA. This differs from the scope of the ADA disability discrimination provision, 42 U.S.C. § 12112(a), which may be invoked only by a 'qualified individual with a disability.'" *Id.* at 502.' (some citations omitted) (emphasis added). Thus, "[a]n individual who is adjudged not to be 'a qualified individual with a disability' may still pursue a retaliation claim under the ADA." *Id.*

With this background in mind, we begin our inquiry into whether the evidence at trial was sufficient to allow a reasonable juror to find for Shellenberger on her retaliation claim under either a "pretext" or "mixed-motive" theory. We conclude that her proof was sufficient to survive Summit's Rule 50 motion under either theory.[6]

■  The ADA provides:

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA].

42 U.S.C. § 12203(a) (2002). Thus, it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA. This obviously includes the filing of a charge of discrimination with the EEOC. As noted earlier, retaliation claims under the ADA are analyzed under the same framework as Title VII discrimination claims. *Krouse*, 126 F.3d at 500. A plaintiff may use either direct or circumstantial evidence to prove retaliatory animus under the ADA. *See Shaner v. Synthes*, 204 F.3d 494, 501 (3d Cir.2000).

■  The district court found that Shellenberger did not produce sufficient evidence to establish a *prima facie* case, because she had not shown a causal link between her protected activity and her termination. The district court found that: (1) there was no evidence that Summit or Fungard ever received notice of the EEOC complaint; (2) Fungard's statement about "taking the legal route" was never confirmed as referring to Shellenberger's filing of the EEOC complaint; and (3) there was no evidence that Fungard was a decisionmaker in Shellenberger's termination. App. 14. However, our review of the record establishes that Shellenberger's proof was sufficient to make out a *prima facie* case of retaliation.

Shellenberger filed her first EEOC complaint on July 13, 1998 (two months before she was terminated), and it is uncontested

---

**6.** On retrial, the district court "must decide whether one or both theories properly apply at some point in the proceedings prior to instructing the jury." *Hankins v. City of Phil-* *adelphia*, 189 F.3d 353, 364 n. 6 (3d Cir. 1999), *citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n. 12, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

that Summit received notice of that filing on August 17, 1998. The district court's conclusion that there is no evidence that Summit received notice of the complaint is therefore contradicted by the record.[7] Moreover, there is also evidence that Fungard had personal knowledge of Shellenberger's complaint. As noted above, at the September 10 meeting where Shellenberger was terminated, Fungard told her: "I know that you're taking the legal route, so you probably just want to consider--just continue in that vein." Even though Shellenberger did not specifically ask Fungard if she was referring to the EEOC complaint, Fungard's statement clearly evinces an awareness that Shellenberger had started legal action against Summit, and a jury could easily conclude that the remark referred to the EEOC complaint.

Furthermore, Fungard was present in Resetar's office when Shellenberger was fired. As the Site Manager of the call center, her presence in Resetar's office during a meeting Resetar called to fire Shellenberger presents circumstantial evidence that Fungard *was* involved in the decision to terminate Shellenberger.[8]

Summit contends that the mere fact that Shellenberger's termination occurred 10 days after Fungard's alleged comment about "taking the legal route" is not sufficient by itself to create a causal link between engaging in the protected activity and the termination. However, we have held that "temporal proximity between the protected activity and the termination is [itself] sufficient to establish a causal link."

*Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1997). The amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation.[9] Moreover, there is more than temporal proximity here.

The timing of Fungard's comment (10 days before the firing) combined with Resetar's comments during the September meeting, could very well lead a reasonable jury to conclude that Shellenberger was fired because she took the "legal route." This was sufficient to establish a *prima facie* case under either a "pretext" or "mixed-motive" theory.

Under the *McDonnell Douglas* framework, the burden now shifts to Summit to articulate some legitimate, non-discriminatory reason for terminating Shellenberger. "The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Krouse*, 126 F.3d at 500 (internal quotation marks omitted), *quoting Woodson*, 109 F.3d at 920 n. 2. The proffered reason need only raise a genuine issue of fact as to whether the employer acted impermissibly. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

██ Summit contends that it fired Shellenberger because she was insubordinate

7. At oral argument, Summit's counsel admitted that Summit received notice of the complaint.

8. Accordingly, we disagree with the district court's conclusion that Fungard's possible involvement is not relevant because "[t]here is no evidence that Ms. Fungard was a decision maker in plaintiff's termination." App. 14.

9. We have also noted that "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Krouse*, 126 F.3d at 503; *see also Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997).

during the September 10 meeting. Summit claims that Shellenberger yelled at Fungard, and accused Summit of "poisoning" her through the air ventilation system. Summit also contends that Shellenberger issued an ultimatum that Summit either establish a fragrance-free work environment or provide Shellenberger with an enclosed cubicle equipped with a special air filtration device. Summit supports its claim that the firing resulted solely from Shellenberger's insubordination by referring to a letter Shellenberger wrote to Dr. Buttram in October 1998. In that letter, Shellenberger speculated that Summit fired her because the company was "pissed off" that she had raised her voice to Fungard during the September meeting.

Having been presented with this non-discriminatory explanation, Shellenberger then had to prove by a preponderance of the evidence that the insubordination was nothing more than a pretext for Summit's true motivation. In other words, Shellenberger had to prove that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Krouse*, 126 F.3d at 501.

There is clearly enough here to allow that decision to be made by a jury. Shellenberger argues that there are inconsistencies in Summit's explanation as to why she was fired, so that a reasonable jury could have found that she was fired because of retaliatory animus. She contends that when she asked Resetar why she was being fired Resetar explained "[w]e can't get along with you or we–we just can't work out our relationship with you." App. at 69. However, when Shellenberger fol-

lowed up by asking if her termination had anything to do with her ability to get along with co-workers. Resetar purportedly responded, "it has nothing to do with that. We just can't work things out with you." *Id.* When asked if she was being terminated due to her disability, Shellenberger claims that Resetar responded, ". . . according to the bank's attorneys, you do not have a disability." *Id.* at 70.

Resetar's choice of words could reasonably be viewed as proof that Summit no longer wanted to be bothered with persistent requests for "baseless" accommodations, and that it was upset that Shellenberger had filed an EEOC complaint against it. This is especially true given the evidence that Summit had conferred with its attorneys and concluded that Shellenberger was not "disabled," and had tired of her persistent requests for an accommodation and/or her lawsuit. Viewing these statements in the light most favorable to Shellenberger, it is clear that a reasonable jury could conclude that she was fired in retaliation for her protected activity rather than (or in addition to) her insubordinate behavior.[10]

### B.

Shellenberger also argues that her requests for accommodation were protected under the ADA and the jury could therefore have also concluded that she was fired for engaging in that protected activity.

Although Shellenberger has not appealed the district court's ruling that, as a matter of law, she did not establish that she was disabled, as noted above, the absence of a disability does not translate into an absence of protection under the ADA.

---

**10.** Under a "mixed-motives" theory, Summit would have an opportunity to demonstrate that Shellenberger would have been fired regardless of her protected activity. *See Miller*

*v. CIGNA Corp.*, 47 F.3d 586, 594 (3d Cir. 1995) (en banc). Given the procedural posture of this suit, no such evidence was admitted at the trial.

The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC, and we have already explained that the ADA protects one who engages in the latter activity without regard to whether the complainant is "disabled." As the court noted in *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir.1997), "it would seem anomalous ... to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge. This would leave employees unprotected if an employer granted the accommodation and shortly thereafter terminated the employee in retaliation." *See also, Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 786 (3d Cir. 1998), ("we see no basis for holding that a person who is adjudged not to have a disability may not assert a retaliation claim based on some form of protected activity other than the filing of a formal complaint."); and *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir.2001) ("to prosecute an ADA retaliation claim for requesting reasonable accommodations, a plaintiff need not show that she suffers from an actual disability.... A reasonable, good faith belief that the statute has been violated suffices.").

▮ The requirement of a good faith request for an accommodation means that the protection from retaliation afforded under the ADA does not extend to an employee whose request is motivated by something other than a good faith belief that he/she needs an accommodation. Congress clearly did not intend to extend the reach of the ADA's umbrella to employees whose motivation for requesting an accommodation is something other than a good faith belief that an accommodation under the Act is necessary or appropriate. However, nothing on this record suggests that Shellenberger's request was motivated by anything other than good faith, and Summit has not argued to the contrary. Accordingly, based upon our review of this record, there is sufficient evidence to allow a jury to conclude that Summit's alleged retaliatory actions violated the ADA. We therefore hold that the district court erred in concluding that Summit was entitled to judgment as a matter of law under Rule 50 on her retaliation claim.

### III. Conclusion

▮ Accordingly, for all the reasons set forth herein, we will reverse the district court's grant of Summit's motion for judgment as a matter of law and remand the case for a new trial.[11]

**11.** Shellenberger attempts to attach some significance to the fact that Summit's counsel "admitted" during opening statements and the Rule 50 argument that Summit fired her due to her protected activity. Shellenberger argues that Summit is therefore estopped from denying this motivation. However, we find that any such admission is irrelevant to the merits of Shellenberger's arguments here because remarks by counsel are not "evidence" for the purpose of evaluating a motion for judgment as a matter of law. *See, e.g., Fineman v. Armstrong World Indus. Inc.*, 980 F.2d 171, 210 (3d Cir.1992) (jury instruction was given by the court that counsel's remarks made during closing argument are not evidence); *Edwards v. City of Philadelphia*, 860 F.2d 568, 575 (3d Cir.1988) (similar jury instruction regarding remarks made during opening statement).