**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3183
_____

THOMAS RINK,

Appellant

v.

NORTHEASTERN EDUCATIONAL INTERMEDIATE UNIT 19, LOUISE
BRZUCHALSKI, ROBERT SCHWARTZ, JOSEPH MURRACO, RICK BARONE,
THOMAS CERRA, CY DOUAIHY, ERIC EMMERICH, HAROLD EMPETT,
KATHLEEN GRANDJEAN, MICHAEL MOULD, ELLEN NIELSEN, CHRISTINE
PLONSKI-SEZER

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 3-14-cv-02154)
District Judge: Hon. Robert D. Mariani
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 14, 2017
_____

Before: GREENAWAY, JR., SHWARTZ, Circuit Judges, and SIMANDLE, Senior
District Judge.[*]

(Filed: December 15, 2017)

_____

[*] Honorable Jerome B. Simandle, Senior District Judge of the United States
District Court for the District of New Jersey, sitting by designation.

_____

OPINION[**]

_____

SIMANDLE, <u>District Judge</u>.

Thomas Rink ("Rink") appeals the District Court's grant of summary judgment to Northeastern Educational Intermediate Unit 19 ("NEIU"), Louise Brzuchalski, Robert Schwartz, Joseph Murraco, Rick Barone, Thomas Cerra, Cy Douaihy, Eric Emmerich, Harold Empett, Kathleen Grandjean, Michael Mould, Ellen Nielsen, and Christine Plonski Sezer (collectively "Defendants" or "Appellees"). Because there is no genuine dispute of material fact that Rink's allegedly protected speech and his eventual termination were causally connected, and because Rink's due process and civil conspiracy claims cannot succeed, the District Court properly ordered summary judgment for Defendants, and we will affirm.

I

This case involves Rink's claim for wrongful termination from his position as the fiscal director of NEIU in 2014. NEIU is a regional education service agency located in Archbald, Pennsylvania, which is a part of the public school system and was established by the Pennsylvania General Assembly; the named defendants are or were Board members of NEIU at the relevant times. Rink had been employed by NEIU since 1981

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

and was made fiscal director in 1994. The principal issue is whether the District Court erred in finding there was no evidence from which a fact finder could reasonably conclude that Rink was terminated in June of 2014 from public employment in retaliation for his cooperating in a federal investigation and sentencing of NEIU's former executive director during the time period of January of 2011 through March of 2013.

In 2010, Fred Rosetti, the executive director of NEIU, retired from his position. Subsequently, the Pennsylvania Department of the Auditor General, the U.S. Department of Education, and the Federal Bureau of Investigation began to investigate Rosetti. This investigation was undertaken largely as a result of Board member Louise Brzuchalski requesting to see Rosetti's contract, calling a local newspaper, and reporting Rosetti to the Auditor General. Rink agreed to assist in this investigation and, on April 22, 2011, was served with a subpoena by a representative of the U.S. Department of Education and the FBI to appear before the Assistant U.S. Attorney, Michelle Olshefski, on May 18, 2011. Rink told Dr. Clarence Lamanna, the new executive director of NEIU, about the visit from the FBI's representative. AUSA Olshefski described Rink as having been responsive to questions, cooperative, and "extremely" helpful. App. 1730-31.

As early as January of 2011, Brzuchalski began calling for Rink to be terminated. AUSA Olshefski stated that it was her recollection that she was "led to believe that the NEIU was blaming Mr. Rink"; in response, in June 2011, she informed Jeff Tucker, NEIU's solicitor, not to take any adverse action against Rink, because that would be interfering with a federal investigation. App. 1732-38; 1766. This position was made clear to Lamanna, as over the course of the following months and years, Lamanna

3

repeatedly told the Board members that they could not take adverse action against Rink because he was a whistleblower.

On February 21, 2012, Rosetti was indicted for financial misconduct relating to his work as executive director of NEIU. Rosetti pled guilty to theft and mail fraud charges in October of 2012 and admitted misusing taxpayer money.

Before Rosetti was sentenced, AUSA Olshefski met with the Board and reaffirmed to the entire Board her earlier statements to NEIU Solicitor Tucker, saying that Rink was not and had never been a target of the investigation, and that Rosetti was the only wrongdoer.

Rosetti was sentenced in March of 2013. At the sentencing, Rink made an impact statement, wherein he described the Board as having "exercised little oversight over" Rosetti's activities: "Monthly meetings were completed in an hour or less, nearly every vote was unanimous, and I was often shocked over the years how some agenda items that I thought to be deserving of some debate would pass unanimously, with not even a question." App. 8-9. Rink also described raising concerns about certain financial improprieties, like a catering charge of several hundred dollars that Rosetti directed him to process as having been for a staff meeting: "As directed to do so, I processed the bill, and it was passed by the Board without question or comment." App. 9. Rink described his cooperation over the previous two and a half years with the investigation of Rosetti, and said that, despite his never having been a target of the investigation or a "willing party in these schemes[,] . . . there are those who continue looking at me as a scapegoat, as well as debating my continued employment in my current position. . . . There are those who feel

4

that I have failed, in some way, and should be removed from this position that I have enjoyed having so much over the years." App. 9-10. He concluded by stating his belief that "[t]he fall-out from [Rosetti's] actions has had and will continue to have a negative [e]ffect on our health, our well-being and our future careers." App. 10. This statement was the only public statement made by Rink and was made under oath.

Prior to this, in June of 2012, after Rosetti was indicted but before he pled guilty, NEIU replaced its auditor (which had one year left on its contract) with Brian T. Kelly & Associates ("the Kelly Firm"). Rink believed the Board wanted to replace the auditors because there was a question as to whether auditors should have noticed Rosetti's misconduct and because the Board was "looking for a scapegoat." App. 192. Lamanna testified that he believed the Board replaced its old auditors because "they wanted a new face" and because of concerns that the "difficulties inherent in the Rosetti issues" didn't surface. App. 572. The Board asked Rink to get proposals from new auditing firms, and Rink ultimately told the Board that he thought either the Kelly Firm or Robert Rossi and Company would be a good choice. At approximately the same time, the Board established several new committees at the recommendation of Lamanna. This included a finance committee, which monitored Rink's performance.

In November of 2012, the finance committee of the Board met with the new auditors from Brian T. Kelly & Associates: Brian Kelly, Brad Murray, and Larry Mattern. Kelly told the Board members that NEIU's books were unauditable because of accounting irregularities. Specifically, in order to perform the audit, the accountants at Kelly needed a reasonably adjusted trial balance reflected in the books and records of

5

NEIU; Kelly and Murray determined that the "books and records were not reasonably adjusted and didn't accurately reflect a number of items that should have been recorded." App. 1056. Kelly made this determination by ascertaining that the books and records did not accord with the financial statements of NEIU and by looking through the general ledgers and discovering more irregularities. Kelly informed the Board members that the accounting work would have to be fixed before the books could properly be audited, and ultimately charged NEIU approximately $42,000 for the accounting work and $21,000 for the auditing work. Because of these irregularities, Kelly also informed the Board members that he would not be able to complete the annual financial report by November 30, 2012; the delay would leave NEIU facing a possible fine of $300 per day. No evidence contradicts Kelly's determination that, as of November of 2012, NEIU's books were unauditable.

Once Kelly completed the necessary and extensive accounting work and concluded the 2012 audit, there were ultimately thirteen findings of deficiencies or material weaknesses contained in the audit. Another issue uncovered by Kelly was with regard to a possible loss in the amount of $360,000 to NEIU as a result of an issue concerning indirect costs. Murray and Kelly discussed this issue with the Finance Committee in February of 2013. The essential issue was in the determination of the ratio between business office costs and all costs; although another intermediate unit told Murray that they calculated this ratio in the same way as NEIU, when Murray contacted the Bureau of Audits in Harrisburg, the Bureau informed him that NEIU's method of calculation was incorrect and constituted "double-dipping." App. 1065.

6

On at least one occasion, Lamanna raised the issue with Kelly and Murray of why Rainey (NEIU's previous auditor) did not find the issues that Kelly found when preparing for and completing the 2012 audit. In response, Murray told Lamanna that he believed that Rainey's audit must have been deficient, because all of these issues would have existed and should have been raised by the previous auditors.

In July of 2013, Lamanna gave Rink a corrective action plan, directing him to address the deficiencies noted in Kelly's 2012 audit. Lamanna told Rink that if he did not correct the findings in the 2012 audit, Rink would be terminated.

The following year, Kelly's audit for fiscal year ending in June of 2013 showed only 5 findings, compared to the thirteen findings in the previous year's audit. The "double-dipping" problem identified by the Bureau of Audits had been eliminated. Id. Lamanna characterized the 2013 audit as having shown that Rink had improved but not eliminated the problems identified in the previous audit. For the fiscal year ending June 30, 2014, Kelly's audit effectively showed no findings (two findings were recited but these were only required to be reported because of previous findings in earlier audits). Rink was employed as the fiscal director for NEIU for eleven of the twelve months at issue in the audit for the fiscal year ending June 30, 2014.

In January 2014, NEIU's then-solicitor, John Audi (who had replaced Jeff Tucker), recommended that an independent consultant come in to evaluate NEIU's business practices and Rink's performance. In February 2014, Audi spoke to Rink's lawyer and offered Rink an early retirement package; Rink testified that he understood Audi to say that if Rink did not accept the offer, the Board would bring in an independent

7

consultant to point out any mistakes Rink had made. Rink did not accept the early retirement package.

Subsequently, around February or March of 2014, the Board hired George Shovlin, a certified public accountant and lawyer who works in the areas of employment benefits and education law, to conduct an independent examination of Rink's performance as fiscal director and of the business department at NEIU. Before being hired by the Board, Shovlin did not know anything more about Rosetti than what he might have read in local newspapers. Shovlin did not have any knowledge about Rink's involvement in the Rosetti investigation. Shovlin was directed by the Board to focus only on the preceding two years of operations at NEIU and, ultimately, to recommend any changes he thought necessary with regard to Rink's employment status, including suspension, performance improvement plans, termination, or recommending that everything remain as it was. Robert Schwartz, the president of the Board, told Shovlin that NEIU and the composition of the Board, specifically, had undergone many changes since Rosetti's departure; Schwartz himself had only been on the Board for the previous two years or so. Schwartz expressed concern to Shovlin that the Board wanted to make sure that they were treating Rink fairly and not targeting Rink because of Rosetti.

Shovlin then conducted his investigation, speaking directly to Rink and other NEIU employees, interviewing Board members who were on the Audit and Finance Committee, and reviewing the audit reports and other records. During the course of Shovlin's investigation, he expressed to Brad Murray, one of the accountants from the Kelly Firm, that he was "amazed" that the adjustments to NEIU's books and records that

8

were required for the auditing process weren't done before Kelly came in to perform the 2012 audit. App. 1053.

On May 15, 2014, Shovlin presented his initial report to the Finance Committee, and on May 20, 2014, to an executive session of the Board and subsequently to NEIU's Board as a whole.

Shovlin's report noted that the 2012 audit performed by Kelly resulted in 226 adjusting journal entries, and the 2013 audit in 49 adjusting journal entries, while a normal amount in any given year would be under 10 adjusting journal entries; Shovlin did note, however, that some of the 49 adjusting journal entries from 2013 were holdovers from 2012 findings. While the Annual Financial Report ("AFR") and independent audit report for 2012 were filed late (in part because of how many adjusting journal entries there were), NEIU did not actually incur fines or penalties because of this. Shovlin also reported an adjustment of over $291,000 that had to be made regarding the 2012 financial reports because there was an error in reporting payroll liabilities to account for a 2% reduction in employees' Social Security taxes; an adjustment of over $127,000 that had to be made to correct the failure to record future retirement payments owed to employees who had retired that fiscal year; and two adjustments relating to bills owed to Verizon. The first Verizon bill, for an amount over $449,000, was incorrectly not reported as a liability or an expense in the 2012 financial report, Rink claimed, because it was being disputed. In 2013, however, there was another Verizon bill for over $229,000, that Rink told Shovlin was not listed as a liability because he "blew it"; although some or all of this bill was also being disputed, Rink mistakenly put it into the "pile" of "bills to

9

be paid," rather than liabilities. App. 1173-75. Shovlin also pointed to the late filing dates for the 2012 AFR and independent audit reports as having been caused in large part by the extraordinary number of adjustments that had to be made. Also of note was Rink's failure to cut off the books and financial records at the end of the fiscal year on June 30, 2012, and NEIU's failure to collect and remit sales tax as part of its auto repair program.

Shovlin noted that his interviews with Lamanna and other staff at NEIU, as well as his own interviews with Rink, left the impression that Rink was likable, honest, and well-regarded interpersonally; he wrote that he considered Rink "a gentleman in every positive sense of the word." App. 1192-93. He also found fault with the performance improvement plan on which Lamanna had placed Rink; he felt that with a better plan, Rink could have made more improvement from the issues noted in the 2012 reports to the 2013 reports.

At the meetings in May of 2014, Shovlin did not make a specific recommendation as to whether to terminate Rink, renew his employment, or take any other employment action. He did tell the Board that, in his estimation, the issues he had discovered, the materiality of those issues, and the number of issues, warranted Rink's termination if the Board chose to do so. Shovlin believed that case law supported terminating Rink for neglect of duty. He did not believe that the Board should take no action with regard to Rink's employment status; the issues uncovered warranted action by the Board, and although Rink had improved under the performance improvement plan, significant issues still remained. Shovlin also recommended that a disciplinary hearing be held to go over the issues he had uncovered with Rink's performance during his investigation. All twelve

10

members of the Board then voted not to renew Rink's employment as of June 30, 2014 (the end of the fiscal year). The Board characterized this decision as one not to renew Rink's employment, rather than as a dismissal for cause. The next day, May 21, 2014, a letter was sent to Rink informing him of the Board's decision not to renew his employment, effective June 30, 2014. The letter also informed him that he was not to return to work after May 20, 2014, and Rink did not do so.

Rink had no written employment contract. While Rink was promoted to his position on a permanent rather than acting basis in 1994, as of about 2000, he believed that his employment was deemed perpetual unless he, for instance, committed a great crime. None of the employees of NEIU, except for the executive director, had specific employment contracts with NEIU or anything stating a term of employment. This included Rink. However, the Board did vote annually to provide Rink with a raise in salary.

In late June of 2014, Rink received a letter from NEIU's solicitor informing him of the opportunity to request a hearing regarding his termination for cause. Rink's counsel declined to demand a hearing. That was Rink's notice of hearing provided to him before the hearing occurred. Despite Rink's refusal to demand a hearing, the Board scheduled and held a hearing on July 23, 2014; however, Rink did not attend the hearing. After the hearing, an adjudication and determination were made to terminate Rink for cause. On September 23, 2014, the Board confirmed this determination, passing a motion to dismiss Rink for neglect of duty effective at the conclusion of June 30, 2014. At a Board meeting on October 2, 2014, the Board adopted a motion to amend the

11

adjudication to reflect that Rink was fired for cause as of June 20, 2014.[1] At Rink's

deposition, he testified that, to his knowledge, no one else who had participated in the

Rosetti investigation (approximately five other people) had been terminated by NEIU.

Rink filed this lawsuit in November of 2014 in the United States District Court for

the Middle District of Pennsylvania. He alleged that NEIU harassed and terminated him

in retaliation for Rink exercising his First Amendment rights in testifying against Rosetti;

that NEIU violated his right to due process by not providing him with an explanation of

the reasons for his termination or an opportunity to be heard before he was terminated;

that the defendants engaged in an unlawful civil conspiracy to retaliate against and

terminate Rink; and that the defendants violated the Pennsylvania Whistleblower Act, 43

Pa. Stat. and Cons. Stat. Ann. § 1422. After extensive discovery, the defendants filed a

motion for summary judgment on January 29, 2016. After briefing by both parties and

oral argument, the court granted the defendants' motion on July 18, 2016. The court

entered judgment in favor of defendants and against Rink. Rink appeals.

## II[2]

We exercise a plenary standard of review over the District Court's entry of

judgment in favor of defendants, and we apply the same standard for summary judgment

as the District Court. Chavarriaga v. N.J. Dep't of Corrs., 806 F.3d 210, 218 (3d Cir.

2015). Summary judgment is appropriate where there is no genuine issue as to any

---

[1] The record does not indicate a reason for this effective date rather than the previous effective date of June 30, 2014.
[2] The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367; we exercise jurisdiction pursuant to 28 U.S.C. § 1291.

material fact, and the moving party is entitled to judgment as a matter of law; while the non-moving party is entitled to the benefit of all reasonable factual inferences from the evidence, the non-movant "must point to some evidence in the record that creates a genuine issue of material fact." N.A.A.C.P. v. City of Philadelphia, 834 F.3d 435, 440 (3d Cir. 2016) (citation omitted). "[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014) (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990)).

Rink advances two major grounds for error by the District Court. First, he argues that the District Court erred as a matter of law when it found that there was no genuine dispute of material fact regarding whether there existed a causal connection between Rink's protected speech and the decision to terminate his employment. Second, he argues that the District Court erred as a matter of law in determining that Rink lacked a protected interest in his continued employment entitling him to procedural due process protections he did not receive. He also contends that the District Court wrongly granted summary judgment on his civil conspiracy claim. We will address these arguments in turn.

A.

1.

Rink claimed that NEIU retaliated against him in violation of his First Amendment rights (Count I). In order to make out a claim of First Amendment retaliation under 42 U.S.C. § 1983, a plaintiff must show that 1) the plaintiff engaged in activity protected by the First Amendment; 2) the defendant took retaliatory action against the plaintiff

13

"sufficient to deter a person of ordinary firmness from exercising his or her rights"; and 3) a causal nexus existed between the protected activity and the retaliation. Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). This circuit has also framed the claim's required showing as first, that the plaintiff engaged in "speech [that] is protected by the First Amendment," and second, that "the speech was a substantial or motivating factor in the alleged retaliatory action . . . [;] if both are proved, . . . the burden [shifts] to the employer to prove that . . . the same action would have been taken even if the speech had not occurred." Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 466 (3d Cir. 2015).

Here, the District Court ruled that Rink had not put forth sufficient evidence to allow a reasonable finder of fact to conclude that his speech against Rosetti was a "substantial or motivating factor" in Rink's termination by NEIU.[3] App. 20. We agree.

In order to establish the required causal connection, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W., 480 F.3d at 267. If a plaintiff cannot make either showing, "the plaintiff must show that from the evidence gleaned from the record as a whole the trier of fact should infer causation." Id. (internal quotation marks omitted). The protected activity need not be the only motive behind the retaliatory action; summary judgment should not be granted in the case "[w]here a reasonable inference can be drawn

---

[3] Accordingly, the court did not address whether NEIU could prove that the same action would have been taken even if Rink had not spoken against Rosetti.

that an employee's speech was at least one factor considered by an employer in deciding whether to take action against the employee[.]" Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 795 (3d Cir. 2000). Nevertheless, this circuit has recognized that courts "must be diligent in enforcing these causation requirements[.]" Lauren W., 480 F.3d at 267. A party opposing a motion for summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (internal quotation marks omitted) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

Rink submits that the District Court erred in not crediting the evidence he proffered as sufficient to allow an inference that NEIU exhibited a pattern of antagonism toward Rink after he participated in the Rosetti investigation. It appears that Rink does not argue that there existed an "unusually suggestive temporal proximity" between his participation in the Rosetti matter and his termination; nor can he reasonably do so, as the temporal proximity contemplated to allow for such an inference is on the order of days or weeks, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-80 (3d Cir. 2000); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003), rather than the 15 months (from Rosetti's sentencing in March of 2013 until Rink's termination in June of 2014) that elapsed here.

Instead, Rink submits that "the pattern of antagonism" by the Board began after NEIU "learned that Rink was being cooperative in the investigation and [had] responded to the subpoena," and the "pattern intensified after the sentencing" where Rink made an impact statement. Appellant's Br. at 15. However, an examination of the record does not

15

reflect evidence to allow for a reasonable inference of the existence of a retaliatory motive behind "the pattern of antagonism" to which Rink refers.

Rink argues that his belief, relying on his deposition testimony, that "the Board was influencing the Kelly Firm" is based on the following: 1) "Bob Schwartz, Louise Brzuchalski and Joe Muracco started having discussions with the Kelly Firm right after the audit began which is not typical"; 2) "the Kelly Firm continuously made negative comments to the Board about [Rink's] performance"; 3) the previous auditors had made only one finding against him, but the Kelly Firm made "13 written findings," many of which Rink believes to have been minor and not worthy of written findings; and 4) Kelly did not bring up these potential findings in advance with Rink and allow Rink to "straighten out" those issues with Kelly before bringing them to the attention of Board members, which is "just not the way the process usually works." Appellant's Br. at 16-17. Rink characterizes this last issue as Kelly having "blind-side[d]" Rink. Id. Rink's critique of the Kelly auditors does not withstand scrutiny, as now discussed.

None of these alleged facts, even taken in the light most favorable to Rink, tend to allow for a reasonable inference that the Board was influencing the Kelly Firm or that it was doing so in retaliation for Rink's protected speech. First, Rink himself had a hand in choosing Kelly when Rink indicated to the Board that the Kelly Firm would be an acceptable choice for a new auditor, a fact which logically implies Kelly's independent auditor status. Second, each of the facts to which Rink points are notable only because he asserts them to be so (i.e., that Board members spoke directly with members of the Kelly Firm, or that some of Kelly's findings were relatively minor). Moreover, the record

16

confirms that the Kelly Firm's methods were, even if another auditor may have done things differently, a reasonable professional practice. Kelly's discussions with the Board and its professional auditing methods simply do not give rise to an inference of collusion with the Board. It was not disputed that Kelly found the books and records to be unauditable. In this dire circumstance, if the Board had hypothetically brought in new auditors whom they wanted to be more exacting than previous auditors because the Board believed that it had been too lax or too generous to management in light of the malfeasance committed by the former executive director, one could only reasonably find that the practices complained of by Rink would be undertaken by the new auditors, e.g., direct interaction with Board members, erring on the side of making findings even out of relatively minor issues, erring on the side of making written findings rather than verbal warnings, making sure Board members were directly apprised of all findings. None of these actions, then, allow for a reasonable inference that the Kelly Firm was colluding with the Board, much less that it was doing so to retaliate against Rink for a protected activity, given the unauditable nature of the books Rink maintained as of 2012.

Indeed, one of Rink's experts, Stephen J. Scherf, CPA/CFF, CFE, wrote in his report that the reason for the discrepancy between the old auditors' reports on Rink's performance and Kelly's report was attributable to "a difference in professional judgment" between the auditors' firms. App. 1776. While Scherf stated that "it has not been established that the lack of findings on the part of the Bonita & Rainey firm represents anything more than a difference in professional judgment," he also did not attribute Kelly's findings to anything other than this difference or note what he

17

considered to be bias, unfair treatment, or unusual practices by the Kelly Firm in its audits of Rink and NEIU. Id.

Rink also submits that the District Court erroneously overlooked the evidence offered by his expert witness, Patrick M. Sable, Pennsylvania Registered School Business Administrator ("PRSBA"). The Court has reviewed Sable's report, which states, in essence, that Sable believes several of the findings made by Kelly against Rink could have been "identified as verbal findings and resolved quickly"; if they were not corrected in the next year, "then" those findings "may rise to a written comment because of compliance failure." App. 1795. Sable also stated that providing Rink with "a fair opportunity to take corrective action" would have been "reasonable and customary." Id. However, nothing in Sable's report suggests that it was unusual or unreasonable to instead log the findings as written findings and submit them to the Board, especially in a situation, as here, where Kelly was brought in as a fresh pair of eyes or "a new face," App. 572, to take a renewed look at NEIU's operations in light of the Rosetti issues and serious deficiencies in accounting practices. Likewise, the Sable report does not take issue with the serious structural deficiencies that Kelly found in November of 2012 to render the books "unauditable," as discussed above. Furthermore, the evidence is uncontested that Rink was provided with a fair opportunity to take corrective action in the form of his Performance Improvement Plan. We do not see how Sable's opinions to which Rink points would have changed the District Court's analysis or decision.

Rink suggests that the District Court erroneously overlooked part of AUSA Michelle Olshefski's testimony wherein she stated her impression that NEIU and Louise

18

Brzuchalski, specifically, were blaming Rink, among other individuals, for Rosetti's conduct. While Ms. Olshefski did testify to that, that still does not allow for a reasonable inference in light of the evidentiary record taken as a whole that the "blame[]" NEIU and Brzuchalski placed on Rink (and others) (App. 182), caused them to retaliate against Rink for his cooperation with the government investigation by hiring the Kelly Firm, colluding with them, or directing their audit so as to manufacture a reason to terminate Rink—which is the issue here. Furthermore, Rink's own testimony offers evidence that Louise Brzuchalski pushed for Rink's termination, according to Lamanna, as a result of the Rosetti issues as early as January of 2011; this was not only before Rink spoke at Rosetti's sentencing but also before he was served with a subpoena from the U.S. Attorney. Such evidence therefore undercuts Rink's contention that Brzuchalski's alleged blaming of him was retaliation for his protected activity of cooperating with the subsequent federal investigation and testifying at Rosetti's sentencing, rather than his own shortcomings in maintaining the financial books and records.

Rink argues that the District Court improperly credited the testimony of Kelly, Murray, and Shovlin (all of whom testified that no one on the Board, nor anyone else, asked them to find fault with Rink) and of Kelly and Murray (when they testified that NEIU's books were "unauditable" and criticized Rink's accounting practices), and that such a decision should have been left to the finder of fact. However, such a decision need only be left to the finder of fact at trial if there is evidence on the other side of the issue that would allow for a reasonable inference to the contrary, and here Rink has not pointed to any such evidence. There is only his own speculation, based on his own further

19

speculation as discussed above, that the Board colluded with the Kelly Firm or with Shovlin to find fault with him. His own proffered experts did not characterize Kelly's findings as being the result of anything other than Kelly and Murray's professional judgment, in which reasonable outside auditors could differ in approach or emphasis. Kelly, Murray, and Shovlin did not testify as experts and did not offer their opinions as such, and therefore there is no reason to disregard any parts of their factual testimony; nor did the District Court improperly construe any of their testimony as expert opinions. "If a witness is not testifying as an expert, testimony on the form of an opinion is limited to one that is . . . rationally based on the witness's perception; . . . helpful to clearly understanding the witness's testimony or to determining a fact in issue; and . . . not based on scientific, technical, or other specialized knowledge within the scope of [Fed. R. Evid.] 702." Fed. R. Evid. 701. Courts "allow[] professionals to give lay opinions when the opinions are based on personal knowledge of the issues, along with specialized experience." U.S. v. DeMuro, 677 F.3d 550, 562 (3d Cir. 2012). Here, Kelly, Murray, and Shovlin testified to their own work and their own findings based on personal knowledge, as well as their perceptions about what the Board retained them to do. This Court discerns no error with the consideration of their testimony.

Kelly, Murray, and Shovlin's testimony—as well as the testimony of the deposed members of the Board—that they were hired to audit NEIU and to review Rink's performance (respectively), and that they did not discuss Rosetti with members of the Board, or even know that Rink had made the statement at Rosetti's sentencing hearing, cannot create a genuine dispute of material fact where Rink has presented no evidence,

20

beyond his own surmise and speculation, as to whether the Kelly Firm and Shovlin were in fact hired to manufacture or otherwise provide a pretextual reason to terminate him. This is not a case where Rink has adduced evidence from which a reasonable fact-finder could find he carried his "burden of establishing [that] his protected conduct . . . served as a substantial or motivating factor in his dismissal." <u>Baldassare v. New Jersey</u>, 250 F.3d 188, 200-01 (3d Cir. 2001). <u>Cf.</u> <u>Feldman v. Philadelphia Hous. Auth.</u>, 43 F.3d 823, 831 (3d Cir. 1994) ("The record is replete with evidence from which [a] jury could properly conclude that [a plaintiff's] firing was directly precipitated by his engaging in protected speech"; accordingly, "[the defendants'] attack on [the plaintiff's] alleged incompetence as the reason for his dismissal raised a jury issue.").

Other evidence undercuts Rink's contention as well: that Louise Brzuchalski, the member of the Board who was one of the greater proponents of supposedly "blam[ing]" Rink (App. 182), allegedly for embarrassing and blaming the Board during his sentencing statement, herself invited more potential embarrassment of the Board by alerting the media and Auditor General to Rosetti's improprieties in the first place; that no other participant in the Rosetti investigation was terminated besides Rink; or that the hiring of the Kelly Firm occurred nine months before Rink criticized the Board at Rosetti's sentencing, where Rink has presented no evidence of what protected activity he undertook <u>before</u> Kelly was hired that would have provoked the Board's animus and retaliatory motive he ascribes to it. In light of the Board's own acquiescence in (and indeed, initiation of) the investigation, Rink does not proffer a reason why simply

21

complying with a subpoena would have provoked the retaliatory animus in the Board that his sentencing statement (which cast some blame on the Board) would have.

The Court agrees with Appellees that "there is simply no evidence that there was an agenda to wrongly find fault with Rink's accounting practices through the hiring of auditors [and an] investigator" and relying on their findings as a basis for terminating Rink in June of 2014. Appellee's Br. at 36. We therefore affirm summary judgment on this claim.

2.

For the same reasons, the Court upholds the District Court's decision to grant summary judgment on Plaintiff's claim of retaliation under the Pennsylvania Whistleblower Act (Count IV). The Pennsylvania Whistleblower Act states that "[n]o employer may discharge . . . or retaliate against an employee . . . because the employee . . . makes a good faith report . . . [of] an instance of wrongdoing or waste by a public body or an instance of waste by any other employer"; nor may an employer "discharge . . . or retaliate against an employee . . . because the employee is requested by an appropriate authority to participate in an investigation, hearing or inquiry held by an appropriate authority or in a court action." 43 Pa. Cons. Stat. § 1423. The causal connection between the protected activity and the retaliation is established in the same manner as under Title VII and § 1983: by a showing of temporal proximity along with a pattern of antagonism. McAndrew v. Bucks Cty. Bd. of Comm'rs, 982 F. Supp. 2d 491, 505 (E.D. Pa. 2013). For the same reasons that the Court holds that Plaintiff did not present the required

22

evidentiary record to support a causal connection between his protected speech and his termination in the First Amendment context, the Court similarly holds that Plaintiff has failed to present the required evidentiary record from which a reasonable fact finder could find a causal connection between his cooperation in the federal investigation and his termination under the Pennsylvania Whistleblower Act. We affirm the grant of summary judgment on this claim.


B.

Rink claimed in Count II that he was denied procedural due process rights. The District Court granted summary judgment to Defendants on this claim, and we affirm.

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006) (internal quotation marks omitted). A property interest is not created by the Constitution; rather, it is created and its dimensions "are defined by existing rules or understandings that stem from an independent source such as state law[.]" Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).

Rink claims he had a protected property interest in his continued employment by NEIU. We have previously held that "[t]o have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." Elmore v. Cleary, 399 F.3d

23

279, 282 (3d Cir. 2005). We have also held that "[t]he hallmark of a constitutionally protected property interest is an individual entitlement that cannot be removed except for cause." Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1078 (3d Cir. 1990) (internal quotation marks omitted). We look to Pennsylvania law to ascertain whether Rink had such a constitutionally protected property interest.

Rink contends that he "was statutorily protected from removal during his term of employment in that Section 10-1089 of the Pennsylvania School Code, 24 Pa. Cons. Stat. § 10-1089, needed to be complied with and in that he had an implied promise of continued employment based on his history and experience with NEIU." Appellant's Br. at 24-25.

Section 10-1089, which applies to school business administrators like Rink, provides in relevant part:

> (b) The governing board [of a school entity] may enter into a written employment agreement with a person . . . to serve as a business administrator . . . . The agreement may define the period of employment, salary, benefits, other related matters of employment and provisions of renewal and termination of the agreement.
> (c) Unless otherwise specified in an employment agreement, the governing board shall, after due notice, giving the reasons therefor, and after hearing if demanded, have the right at any time to remove a business administrator for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth or other improper conduct.

24 Pa. Cons. Stat. § 10-1089(b)-(c).

In general, Pennsylvania employment law operates against a backdrop of at-will employment: "Exceptions to the doctrine [of at-will employment] have generally been limited to instances where a statute or contract limits the power of an employer

24

unilaterally to terminate the employment relationship." Knox v. Bd. of Sch. Dirs., 888 A.2d 640, 647 (Pa. 2005). Under Pennsylvania law, an at-will employee may be terminated by an employer "with or without cause, at pleasure, unless restrained by some contract." Shick v. Shirey, 716 A.2d 1231, 1233 (Pa. 1998) (quoting Henry v. Pittsburgh & Lake Erie R.R. Co., 21 A. 157, 157 (Pa. 1891)).

It is undisputed that NEIU and Rink did not have a written employment agreement. Knox holds that § 10-1089 applies to school business administrators who do not have written employment agreements. 888 A.2d at 649. However, § 10-1089(c) "does not provide a school business administrator with employment for life absent misconduct falling into one of the enumerated statutory circumstances. . . . Rather, Section 10-1089(c) merely provides a business administrator with a certain degree of job security against removal during the term of his employment, whatever that term, as established by the agreement of the parties, might be." Id. at 649 (emphasis added).

The District Court held that Rink was not removed from his position at the May 2014 Board meeting, but rather that the Board voted at that meeting not to renew his employment for the following year. The District Court also held that Rink was an at-will employee and that Rink did not produce any evidence, beyond his own subjective expectation, that he and NEIU entered into a verbal agreement establishing a specified term of employment "sufficient to give rise to a property interest" in his continued employment, nor any evidence that NEIU's policies and practices gave rise to an expectation of such continued employment. App. 34-35. The District Court also pointed

25

to the following statement made by Rink at Rosetti's sentencing acknowledging his employment was at-will:

> In May of 1999, near the end of his first year in the Executive Director position, Dr. Rosetti threatened to fire me and clear out my whole department over a seemingly minor question raised by a member of my office staff. While things quieted down afterwards, it was quite clear to me that I had better be cautious in my dealings with this man. That same day, I sought out legal counsel, and was told that Pennsylvania was an employment at-will state, and that, unless I had an employment contract, I could be terminated at any time.

**App. 9.**

While Rink's subjective expectation may have been "perpetual" employment absent misconduct, the case law is clear that an employee's "subjective expectation of continued employment [does] not spawn a property or liberty interest activating protectable procedural due process rights." Skrocki v. Caltabiano, 505 F. Supp. 916, 919 (E.D. Pa. 1981). An at-will employee, in general, has no specific term of employment. While a plaintiff's "long-term relationship with his employer" may "provide[] some indicia of his expected term of employment" under Knox, 888 A.2d at 650, there is simply insufficient evidence in the record before us to conclude that Rink was anything other than an at-will employee of NEIU who had no specific term of employment. This is especially true here, where Lamanna informed Rink in 2013 that he was in danger of being terminated if he did not improve his performance to a certain level and Rink stated that he believed himself to be an at-will employee in danger of termination at any time. Rink cannot point to evidence in the record that shows that NEIU was contractually prohibited from not renewing his employment. Where courts have found otherwise, it has

26

been on the basis of some additional evidence, such as an oral contract formed by an employer telling an independent contractor that she would be employed for a particular period of time. See Farr v. Chesney, 437 F. Supp. 521, 525-528 (M.D. Pa. 1977).

A closer question is presented by whether § 10-1089(c) of the Pennsylvania School Code created for Rink a protected interest, such that some kind of process was owed to Rink under the Due Process Clause.

The wording of § 10-1089(c) concerns itself only with removal of a business administrator for "incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth or other improper conduct," unless "otherwise specified in an employment agreement." 24 Pa. Cons. Stat. § 10-1089(c). Rink had no employment agreement, and nothing in § 10-1089(c) confers an expectation against termination for no reason, i.e., at will, because the statute only applies to the specified types of termination for cause. The statute gives only a measure of assurance that, if a business administrator is about to be fired for one of the specified reasons, the governing board must give notice of reasons and an opportunity, if demanded, for a hearing. This appears to be a procedural protection rather than an expectation of continued employment absent good cause to terminate. In other words, if a governing board offers no reason but simply decides to terminate the business administrator at will, nothing in § 10-1089(c) prevents the board from doing so. Thus, this statute does not create a property interest in continued employment, but it instead provides a procedural protection if the proposed termination is for a listed type of misconduct. But even if one assumes for the sake of argument that Rink had a property interest in continued employment through some

27

combination of § 10-1089 and the customs and understandings of NEIU, it is clear that Rink cannot satisfy the second prong of his procedural due process claim because NEIU gave him the process that was due.

To the extent that the Board's decision at the May Board meeting, which it characterized as a decision not to renew Rink's term of employment for the following year, constituted the "remov[al]" of a "business administrator" "for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth or other improper conduct," the Board may have been required to provide Rink with "due notice, giving the reason" for the removal, and to provide Rink with a hearing if he demanded one. 24 Pa. Cons. Stat. § 10-1089. Such notice and opportunity to request a hearing would satisfy any due process obligations. By later making the determination that it was terminating Rink's employment as a business administrator for cause, the statutory protections of § 10-1089(c) were triggered.

Assuming that Rink qualified for the statutory protection afforded by § 10-1089(c), Rink nevertheless cannot prevail upon his claim for failure to provide procedural due process where, as here, NEIU provided Rink with the opportunity to demand a hearing on June 27, 2014, prior to the effective date of termination on June 30, 2014. App. 1652. No copy of the NEIU solicitor's letter containing the notice of hearing appears in the record, but Rink has not challenged the adequacy of notice in advising him of the purposes of the termination hearing. The statute, in setting up this pre-termination hearing right, required NEIU to convene a pre-termination hearing only "if demanded." 24 Pa. Cons. Stat. § 10-1089(c). NEIU was thus not obligated to convene a hearing on its

own. Rink, through counsel, indicated in a letter of July 7, 2014 that Rink was explicitly "not demanding a hearing on his dismissal for-cause." App. 1652. Rink's counsel's assertion that, since the June 30th termination date had elapsed, "the NEIU Board no longer has the power to require him to demand a hearing," is misplaced. The statute leaves to the employee the opportunity to demand a hearing, which Rink could have done whether or not NEIU formally offered that opportunity to him. Had Rink's counsel demanded a hearing at some time before the July 7, 2014 deadline, the prospect of staying the June 30th termination pursuant to § 10-1089(c) would be raised, but that is not the issue here.

We have previously held that "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000). Rink submits that he was entitled to a hearing before the alleged deprivation of his property interest and that a hearing in July after the Board voted not to renew his contract in May was therefore inadequate. We disagree. The evidentiary record indicates that the Board informed Rink that the conclusion of Rink's employment with NEIU would come "at the conclusion of the June 30, 2014, workday." App. 1652. Rink in fact enjoyed the opportunity to request a hearing and declined. He later, through counsel, declined the opportunity to participate in the Board-scheduled hearing on July 23, 2014. App. 1652-53. We find that this is the situation contemplated in Alvin: "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." 227 F.3d at

29

116. The Board provided Rink with the due process protections § 10-1089(c) requires, and his claim that he was denied procedural due process cannot succeed.

For the foregoing reasons, we therefore affirm the District Court's grant of summary judgment to Defendants with regard to Rink's procedural due process claim.

## C.

We also affirm the District Court's grant of summary judgment on Rink's claim of civil conspiracy in Count III. There can be no civil conspiracy to commit an unlawful act under § 1983 where the plaintiff has not proven a deprivation of a constitutional or federal statutory right or privilege. See Black v. Montgomery Cty., 835 F.3d 358, 372 n.14 (3d Cir. 2016); Bazzi v. City of Dearborn, 658 F.3d 598, 602 (6th Cir. 2011). Here, Rink has failed to demonstrate that the evidentiary record before the Court allows for a reasonable inference that he was deprived of a federal constitutional or statutory right, nor for a reasonable inference that any of the Defendants made an agreement or plan to deprive Rink of such a right; accordingly, his claim for a civil conspiracy under § 1983 also fails.

## III

For the foregoing reasons, we will affirm the District Court's grant of summary judgment to the Defendants and its entry of judgment on behalf of Defendants and against Rink.